JEANNIE YVONNE CRAWFORD a/k/a Jeannie Yvonne
Purnell *v.* STATE OF MARYLAND

[No. 6, September Term, 1979.]

*Decided July 19, 1979.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, ORTH, COLE and DAVIDSON, JJ.

*Geraldine Kenney Sweeney, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*William H. Kenety, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Sandra A. O'Connor, State's Attorney for Baltimore County,* and *Mark Kolman, Assistant State's Attorney for Baltimore County,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

Lillie May Crawford died on 9 May 1978. The cause of death was "[i]ncised wounds of the neck and chest." [1] The manner of death was homicide. Jeannie Yvonne Crawford, also known as Jeannie Yvonne Purnell,[2] was charged with the homicide.

[1]. The autopsy report of the Department of Post Mortem Examiners and the testimony of an assistant medical examiner showed that the body of the victim contained sixty-five incised wounds (cuts and stabs made with a sharp implement). Forty of them were superficial. Three of the superficial wounds were on the left wrist and were characterized as "defense wounds," that is, wounds received in attempting to ward off an assailant. Twenty-five other discrete wounds were on the head and neck, the left arm, the right arm and leg and the right side of the back. A wound on the left side of the neck was five and a quarter inches long and laid open to a width of one inch. It cut the sternocleidomastoid muscle on the side of the neck and the carotid artery. It alone would have caused death in a couple of minutes. Another was a deeply penetrating stab wound which struck the right lung and could have been a fatal injury. The multiplicity of the remainder of the wounds, when considered in the aggregate, also could have proved fatal. The tip of a knife was imbedded in a muscle near the backbone. It matched a knife recovered in the kitchen of the apartment in which the body was found.

[2]. It seems that the accused had been married to Richard A. Purnell, Jr. and upon being divorced from him had her name legally changed to Crawford.

She was tried before a jury in the Circuit Court for Baltimore County, convicted of murder in the first degree and sentenced to life imprisonment. She appealed to the Court of Special Appeals, and we ordered the issuance of a writ of certiorari on our own motion before decision by that court. The issue for decision is whether the trial court erred in admitting into evidence certain portions of taped recordings of interrogations of the accused by the police. We find that the admission was erroneous, reverse the judgment and remand for a new trial.

The police conducted two custodial interrogations of the accused. The first was shortly after her arrest on the morning the crime was committed and lasted two hours. The second, two days later, continued for about an hour and a half. The interrogations were recorded on tape, and transcriptions were made of the recordings. The accused has never claimed that the statements she made during the interrogations were involuntary in the traditional sense or obtained in violation of the dictates of *Miranda v. Arizona,* 384 U. S. 436, 86 S. Ct. 1602 (1966); at the trial she expressly waived any objection on those grounds. She filed a pretrial motion to suppress this evidence, however, which the court denied upon hearing.

From the moment of her arrest the accused readily admitted that she had stabbed the victim, but she maintained throughout that she had acted in self-defense. She was steadfast in her adherence to that position during the interrogations, and throughout the questioning the police attempted to have her recant her version of the incident by indicating their disbelief in her story, by exhorting her to tell the truth and arguing with her, by recounting what other persons, some named, some unnamed, had told them, by stating their opinions as to what had occurred, and by referring to what the victim had said when deposed five months before her death in a civil proceeding regarding custody of the accused's daughter Renee. At the hearing on the motion and during the trial when the challenged evidence was offered, defense counsel made clear that there was no objection to the statements made by the accused. What he wanted kept from the jury was the comments of the police:

"I think the record should show I have no objection to the answers she gave. I have objections to the testimony, or the alleged testimony of the officers [included in the recordings]." And later he told the court: "Let me just explain myself. I say — I have no objection to the statements she made. What I object to is the statement that the cops make, not only in this area [how the victim's throat was cut] but all through later on. It's — it's their statements, not hers. The question is, should her statements be admitted? The answer is yes, everything that she said." In that context, defense counsel presented the bases for the motion to suppress. The first was that replete throughout the recordings were statements by the police which, if admitted, would deny the accused her constitutional right to be confronted by her accusers. The transcript of the hearing reads:

> THE COURT: Well, that is a stupid argument. Confrontation means the witnesses on the witness stand. And how confrontation and the right thereto can be involved in this motion is beyond me.
>
> MR. [R. CLARK] KINSLEY [defense counsel]: Do you want to hear my reasons?
>
> THE COURT: No. Next reason.
>
> MR. KINSLEY: The statements — I would, of course, like to expand upon it.
>
> THE COURT: No. You have made the point for the record. You say that your right of confrontation has been infringed upon.
>
> MR. KINSLEY: I think the record should also show that Your Honor is pushing this case too rapidly.
>
> THE COURT: Mr. Kinsley, I will run this court. You have made your objection on the record. I have declined to permit you to expand on that.
>
> Would you please state your next basis for objection.

The next basis for objection was that the recordings contained "opinions of the State Police not based on fact, but opinions,

and that this type of evidence should not be presented to the jury, opinions of police officers." The court set out the procedure it thought would solve this problem:

> The jury will be instructed that statements made by way of questions are not evidence and are not to be considered. That is akin to the same type of questioning that occurs every day in a trial court. The jury is instructed they don't pay any attention to the question, it's the answer that they get. And this Court will instruct the jury on all occasions, perhaps even before that piece of evidence is offered, that they are not to consider anything within the content of a question or a statement made, they are merely to consider the answer given by the defendant.
>
> All right. You have made your point.

Defense counsel was not satisfied:

> MR. KINSLEY: But the statement refers to people that the police have talked to, not identifying who they are.
>
> THE COURT: Right.
>
> MR. KINSLEY: And saying what they found out, or allegedly found out, from those people.
>
> THE COURT: Right.
>
> MR. KINSLEY: It also contains a reference to a custody proceeding and refers to alleged happenings at the custody proceeding, such as knife throwing, which is a very vital factor.
>
> THE COURT: It may be. It may well be that as the testimony is offered, that there might be portions thereof that are irrelevant, and as the questions are offered to the jury, appropriate objections can be made at that time.
>
> MR. KINSLEY: If the Court please, throughout this, questions are repeatedly asked, and they don't even wait for an answer, so all we have coming before the jury is —

THE COURT: If a question is unanswered, it will be stricken out.

MR. KINSLEY: But if they play a tape —

THE COURT: They have not yet offered a tape. They may offer a printed transcript of it.

MR. KINSLEY: Then I would ask that the tape be suppressed and only the written transcript be used, so that the Court—

THE COURT: I may suggest that that might be the appropriate way to handle the evidentiary problems.

MR. [MARK] KOLMAN [Assistant State's Attorney]: Your Honor, the State had intended to offer both for purposes of clarity to the jury. I think it's important in the situation, considering the type of case we have got, that the jury actually hear the defendant's words.

THE COURT: All right.

MR. KINSLEY: They will be ringing a bell.

THE COURT: Well, it may well be, but that problem can be taken up when we come to it.

Okay. Next objection, Mr. Kinsley.

The next objection to the receipt of the recordings was that they contain "repeated argument, not opinions, not evidence, not testimony, nothing but pure argument on the part of the troopers, arguing with the defendant, not questions, not answers, but just pure argument." The court merely said: "All right. I understand the objection. Next." Defense counsel asked that the recordings be suppressed "for those reasons." The motion to suppress was denied.

After discussion of other procedural matters, defense counsel returned to the matter of the tapes:

MR. KINSLEY: Now, if the Court please, I would like to know how we should proceed in the introduction of the statement, questions and answers by the State Police.

THE COURT: Well, we'll wait until we get to that

point. We're going to swear a jury in. That's all that's
necessary. That's what you do, number one. Then
you make your opening statement to the jury. That's
number two. Then the State proceeds to call
witnesses. That's number three. And we'll try this
case just like any other. When the State offers
testimony, you object to it, and we'll take it up when
we come to it.

The jury was sworn and trial proceeded.

There came a point in the trial when the State offered the
tapes and a transcript of them. Defense counsel's objection
was summarily overruled and the tapes and transcript were
received in evidence. The prosecutor asked that "the jurors
be allowed to view the copy of the transcript so that they may
follow along with the tape, as it's played." The court said: "It
certainly is preferable, because I never have seen or heard
a tape yet that didn't have some static to it or difficulty."
Defense counsel reminded the court:

But, now, if the Court please, you know, I earlier
raised this objection, and you agreed that there's a
possibility that some of the testimony, some of the
questions, some of the statements of the police is
purely objectionable, and you would rule it out.

The court replied: "When that time comes, I will instruct the
jury to disregard it. I will follow the tapes, as well." This did
not console the defense: "It would seem to me," observed Mr.
Kinsley, "that it would be more appropriate if they didn't
understand and the State's Attorney could read from the
transcript, or the officer could. . . . But if they're going to read
what is objectionable, then the bell has already rung." The
court responded: "This is the expedient way to do it, and I
think it's proper, and the Court will, as I say, as the expression
goes, ride herd on it." At this point, defense counsel pointed
out that his objection did not run to the answers the accused
gave but to the comments of the officers. The court gave
assurance that "[t]here will not be any testimony given by
officers. The only thing that the jury would consider would

be the answers to the questions by the defendant." Defense counsel persisted: "[I]f the Court please, could you instruct the jury that if the officer says, we heard such and such from somebody, that is hearsay?" The court said:

> That is not evidence. The question that somebody asks is not a fact, it's the answer that you are concerned with. The jury should, of course, if during this rather lengthy questioning — it's about thirty-eight pages — if an officer says, now, this is such and such and such and such, is that not true, you listen to the answer. Just because the officer asks the question doesn't make it true. It's just like a lawyer in open court. He says, now, did this and that and the other thing happen? That's not evidence. It's the answer, yes or no. I think the jury can keep it all straight.

It is manifest that at this stage of the proceedings, defense counsel was thoroughly familiar with the contents of the recordings and that the prosecution in all probability was aware of what they contained. It seems, however, that the trial court had not listened to the tapes nor read the transcripts of them, and knew no more of their contents than could be generally gleaned from the discussions of them.

Each juror was given a transcript of the recordings, and the playing of the tapes to the jury was begun. The playing had proceeded only to the point at which the police were giving the *Miranda* warnings when defense counsel interrupted:

> MR. KINSLEY: If the Court please, can we interrupt just for a minute? I think I have the right to interrupt. I think if the jury has the printed transcript — and I have no quarrel with it being an accurate transcript — then I see no reason for having the machine played. I think the trooper should be asked questions, and I think I should be given an opportunity to object to stuff that is extremely extraneous and damaging. It's what they think is the case. It's an opinion.

THE COURT: We've gone into that. The witness is not testifying now, he's merely reciting what took place out of court.

MR. KINSLEY: It's pure theatrics on the part of this gentleman. He's trying to play Cecil B. DeMille, putting on this thing. It's theatrics. If this is the testimony, we have no objection. Why don't we let him read it and let me object to the questions as they come in?

THE COURT: You just don't have your proper time frame. This is not question and answers here in court, this is questioning and answers back on May 9th, an extra-judicial proceeding. Now, the thing either comes in or it doesn't come in.

All right. The expedient point is that if the jury is going to follow this and read it, Mr. Kolman, they can't possibly listen and understand, because if you want to understand that tape, you're going to have to listen and concentrate on that tape. You can't be reading it at the same time, I don't think. But let's try it. You can proceed.

The playing of the tape resumed.

In order to get the full flavor of the proceedings, we set out various objections which were made and the dispositions of them in some detail. The accused was recounting how the victim was cut: "It happened on the bed and we tusseled and we landed on the floor." The interrogating officer said: "Jeannie, I don't buy it, how did her throat get cut?" Defense counsel asked that the officer's comment that he "didn't buy it" be stricken as "argumentative . . . [i]t's opinion." The court did not agree:

> We're not talking about the opinion of that statement, we're just giving the jury the whole picture of how this question took place, whether the trooper believed her or not is beside the point. It's what this jury believes the answers mean.

Now, we've gone into that.

Trial counsel did not give up. He again pointed out that he was not objecting to the statements made by the accused but to those made by the police. The court overruled the objection.

Later on the officer said to the accused: "Ms. Crawford it is very improbable that she received all those wounds and you didn't receive any —" Defense counsel objected and was overruled with this comment by the court:

> The jury has been told three or four times not to pay any attention to the content of a question, except insofar as it provokes an answer. The matter is for the jury to decide and not the interrogating officer.

Defense counsel pointed out that "it's not a question," and was again overruled with direction for the State to proceed.

Further into the interrogation the officer expressed doubt as to how the victim got on the floor, suggesting that she was rolled off the bed by the accused when she took the bed linens off. He said: "Now we can tell by the injuries received on her .... We can tell exactly where she was laying and how she was laying." Defense counsel objected: "It's not a question, it's a statement by the officer." The court: "Go on. Objection overruled." The accused said that "[m]ost of the stabbing took place on the bed because that's where we were fighting that's where she knocked me down —" The officer interposed: "But she had one clear, clean cut around her throat, not a bunch of slashes that you are describing that took place in this fight." Defense counsel: "Objection. It's not a question, it's an opinion of the trooper." The court: "It has to be listened to in the context of the answer. The opinion of the trooper means nothing whatever. It's up to the jury to evaluate all this testimony. Now let's proceed. Objection overruled."

Inquiry about how the victim's throat was cut continued. The interrogator opined:

> It's not the kind of a wound one would receive from a struggle, it appears to be one clean cut. Now, if it happened other than that let's get it all cleared up now. I think there is a little bit more to it and admittedly you said you were frightened, you were scared. Miss Crawford, if you were protecting

> yourself and then got carried away tell us so that we know exactly how it happened because the way you are describing it doesn't match up with the way it happened and she is down at the morgue now and we will have the results in a little while, other injuries and whether she fell on that floor after she was dead or before.

Again objection was made on the ground that it was not a question and again the objection was summarily overruled. As the interrogation continued the officer said:

> I'm sure you are frightened, you have nothing to be frightened of with us, we want to find out exactly what happened, now every time we keep on talking we find out that you are not telling the truth about something else.

Objection was overruled. At another time the tapes reflected the officer's disbelief with what the accused was saying:

> But we are going to learn certain things from the autopsy and from what's found at the scene, the blood on the bed, the blood on the bedsheets, we gonna learn from the blood on the body whether she died on the bed or on the floor, we're gonna learn that, ok.

Defense counsel's objection was overruled and his request that it be stricken was denied. There was objection overruled to the officer's declaration: "Ms. Crawford I don't believe her throat was cut while she had the knife in her hand, it would have been turned around the other way." Further into the playing of the tape defense counsel again indicated his dissatisfaction with the procedure being followed:

> MR. KINSLEY: Your Honor, I'd like to take this opportunity to —
> THE COURT: Hold on a minute.
> MR. KINSLEY: You have —
> THE COURT: Hold on a minute. Do you have an objection?

MR. KINSLEY: I'd like to explain what I have in mind. There's two troopers firing questions —

MR. KOLMAN: Your Honor, I'm going to object, unless he has an objection.

MR. KINSLEY: — and the statements here do not reflect that there's two different troopers.

THE COURT: I don't think it makes any difference whether there were two troopers or three troopers. The question's asked by a trooper and answered by the defendant. The objection will be overruled.

I agree that good police practice is better to restrict interrogation to one questioner, but they'll do it every time. They all want to get in the act.

When the accused told the police that she was afraid during the argument with the victim and that the victim came after her with a knife, the officer made an observation which defense counsel characterized as "the most objectionable statement. This isn't a statement by the defendant. This isn't a question."

The officer said:

> When you got the knife — I think you're gonna feel better if you get all this off your chest — I think you really feel bad now, you feel guilty because you got carried away and you had your chance there and your got rid of her — you just kept doing it — and you're going to feel better after you tell somebody about it — you can't keep it all bottled up inside you Ms. Crawford — you can't keep it all inside you — you can't get all up tight in knots.

The court was not impressed with defense counsel's objection:

> The jury understands it's not a statement of the defendant. They can listen to it and know that it's not, and they know not to pay any attention to the questions of the interrogator. They don't constitute any proof of facts. The jury should pay no attention

to the content of the question, what they consider are the defendant's answers, alone.

Any further objections are overruled.

When the recording of the second interrogation and the transcript of it was offered and received in evidence, defense counsel made clear that his objections were the same as for the first tape. The court said: "All right, same objection, same ruling." The transcript of the proceedings shows further remarks by the court and the defense:

> THE COURT: Mr. Kinsley's objections to portions of this tape are based on the fact that during the interrogation the questioner says this is what happened, this is what happened, this is what happened, and I want — there's a good example in the first question in this tape of May the 11th, the fact that a questioner asserts something isn't proof of that fact, at all. You have to judge this tape and these interviews solely in the context of the answer given to the question.
>
> All right.
>
> MR. KINSLEY: As well as the opinions of the troopers, too.
>
> THE COURT: Well, their opinions aren't evidence.

Whereupon the tape of the second interrogation was played to the jury. The police gave the accused the *Miranda* warnings again. Two troopers participated in the questioning that followed:

Tpr. Williams:
> Ok, Jeannie, we are going to talk about a few things in this incident, first of all I am going to lay it right on the line to you, ok, tell you just what we know, ok, everything that happened to Lillie happened on that bed, you stabbed her on that bed and cut her throat on that bed and she rolled off that bed. You threatened to kill her at 7:00 o'clock when those two maintenance men were changing the lock, we have signed statements from both of them, they heard

you threaten her, we know you hid the knife under the sheets of the bed, under the pillow of the bed, Renee told us that —

Jeannie:

I did what?

Tpr.Williams:

Hid the knife under the pillow of the bed early in the evening.

Tpr. Gallant:

Jeannie, Renee saw you and Lillie fighting earlier.

Jeannie:

I told you —

Tpr. Gallant:

Like you said, like you told us, only thing is it wasn't like you told us.

Jeannie:

I don't know what you mean. I told you exactly what had happened.

Tpr. Gallant:

Renee saw you take, saw Lillie take the knife away from you earlier in the evening —

Tpr. Williams:

Then she saw you take the knife from the, take the knife from the dishwasher and hide it under the pillow and blanket of the bed. She saw it.

Jeannie:

No sir, I didn't do that.

Tpr. Williams:

She has four stab wounds in the back —

Tpr. Gallant:

> Lillie, I mean Jeannie, you know these things have come to our attention since we talked to you last, now, there's no sense beating around the bush, we're not going to beat around the bush and we don't want you to, but we know how you cut her throat we told you we would find out from the autopsy, we know about all the stab wounds, the stab wounds she had and her throat being cut could not have possibly been inflicted as a result of a struggle or an accident.

Jeannie:

> It was a struggle.

Tpr. Gallant:

> It couldn't have been —

Tpr. Williams:

> It couldn't have been Jeannie.

Tpr. Gallant:

> We told you we'd find out from the medical examiners report, now, I think it's about time you tell us —

Jeannie:

> I did tell you, it was, it was, a struggle, it was first a struggle in the living room and I kept trying to get away from her —

Tpr. Williams:

> Did you threaten to kill Jeannie, Jeannie did you threaten to kill Lillie earlier in the evening? We've got two men, two maintenance men who have signed statements, from both of them who heard you threaten to kill Lillie early in the evening —

Jeannie:

> No sir, not that I recall.

**Tpr. Williams:**

Well, I don't know whether or not you recall it or not Jeannie but that's what happened.

**Jeannie:**

I just couldn't stand.

**Tpr. Williams:**

That's what happened —
You couldn't stand what?

**Jeannie:**

I couldn't stand the beatings —

**Tpr. Gallant:**

The beatings — Weren't you the one who was always hittin on Lillie and ranting and raving at her and threatening to throw her out?

**Jeannie:**

No sir.

**Tpr. Williams:**

Everybody we've talked to says so.

**Tpr. Gallant:**

Weren't you afraid she was going to leave you for somebody else?

**Jeannie:**

No sir.

**Tpr. Gallant:**

Sure you were — everybody's told us that, we've talked to a lot of people, a lot of people.

**Tpr. Williams:**

You didn't think we was just gonna stop with talking with you and take your word for what happened?

Jeannie:

Oh, no sir.

Defense counsel could no longer remain silent: "If the Court please, I just can't sit still without making an objection again." The court adhered to its position:

> You have objected constantly, and I am sure that this jury can analyze this tape and this transcript accurately. The statements that are made by the trooper about whether they have talked to a lot of people or haven't talked to a lot of people — that is not proof of whether they did or didn't. The only thing this tape comes in for is what the defendant said.
>
> Now, let's go ahead with it. Your objection is overruled.

During the questioning Trooper Gallant asked the accused about the time she threw a knife at the victim. He remarked: "[W]e've got a deposition that Lillie gave to an attorney." Defense counsel objected and was overruled: "You have a continuing objection, Mr. Kinsley. You have made your point. Let's proceed." The tape continued:

> concerning the custody of Renee, with you present, where she states you threw a knife at her on one occasion and you didn't deny it, do you know what I'm talking about?

The accused said that she did not recall.

The tapes clearly brought out the obvious disbelief of the police in the accused's version of what happened, a disbelief predicated on what the police had learned from other persons. For example, Trooper Gallant said to her:

> Now Jeannie, the medical examiner has given us, we're talking about the medical examiner, he's not playing guessing games, man, when he fills out the report that's it period and he's gonna come to court

and testify and he is going to come to court and make you look like a fool. . . .

Because it couldn't have, it couldn't have gone down that way.

And he asked:

How is it that everybody else we've talked to says it couldn't have gone down that way, and how is it that the medical examiner's report, which is physical evidence and not anybody's opinion, indicates that it couldn't have gone down that way? And, what about the fact that two individuals heard you threaten to kill Lillie earlier in the evening. . . .

He observed:

When we ask these questions and interview these people we are not throwing things into their heads we say tell us how it is, and they are telling us how it is.

He went back to the deposition:

I got this morning a 58 page deposition, notarized, with you present, Lillie present and an attorney in Towson present where Lillie goes over these things saying that yes you have a drinking problem, yes, you have thrown things at her, yes, you threw a knife at her and you don't respond to that, you don't deny any of these things in that statement.

Trooper Williams referred to what he said the accused's daughter had told the police:

Ok, Jeannie, why would your daughter Renee tell us that you hid the knife under the pillow and the bed sheet if it were not true, why would your daughter lie on her own mother? . . . .

Your daughter is as smart as a whip . . . and your daughter knows what she sees Jeannie. . . .

He said:

> Every time we talk to you Jeannie we get another song, we get another story.

After further interrogation Trooper Gallant said:

> Why don't you do this, why don't you just, I mean, you know, as I said we developed all these things that . . . that . . . shoot holes in what you've told us completely, now, why don't you start over again and tell us this time the truth of what happened?

He referred later on to the medical examiner's report:

> [W]e told you from the outset of this that the medical examiner, according to the medical examiner's report uh . . . five stab wounds in the back and 18 to 20 in the front and her throat cut does not constitute injuries that would have occurred in a self defense struggle, so forget that.

Trooper Williams also asked:

> Let me ask you one more thing Jeannie, why do you suppose it is that everybody we've talked to, all of your and Lillie's supposedly friends, family, why is it that everybody is lying to us? You tell us that you're telling the truth, now if you're telling the truth then everybody that we've talked to, and believe me we've talked to everybody, is lying. The medical examiner is lying about the autopsy, your daughter is lying about what she saw, this one is lying about the fact that you're not jealous and that you're not the aggressor, everybody is lying to us according to you.

In the face of the accused's persistence that she was telling the truth, Trooper Gallant reiterated disbelief:

> Jeannie, like I told you before this investigation that we are doing and will continue to do is going to be very detailed and very specific and the wounds, the

autopsy report as I said earlier has shot what you told us full of holes, the medical examiner knows and we know how you cut her throat, whether you did it from the front or the back we know. Now why don't you just tell us what happened and forget this bit.

And this remark by Trooper Williams led defense counsel to move for a mistrial:

I'll tell you what your daughter told us, ok, your daughter said she saw Lillie on top of you, take the knife away from you and lay the knife on the chair, your daughter took that knife and hid it in the third drawer of her dresser in her room, Lillie came and asked your daughter where the knife was, your daughter gave it to Lillie and Lillie put it in the dishwasher, you took it out of the dishwasher and hid it under the pillow.

The court asked the reason for the motion:

MR. KINSLEY: This isn't the defendant testifying, it's these officers. The proper groundwork —

THE COURT: If the State brings the witness in —

MR. KINSLEY: I move for a mistrial.

THE COURT: Overruled. The jury knows that they don't gauge a case on what somebody says outside the courtroom, all they get is here. Now, they should pay no attention to what these interrogators said. That is not evidence of any fact. They should merely listen to the answers.

The jury heard the police say that they interviewed people who said that the victim was terrified of the accused, scared of her because she was "so insanely jealous," that they had proof, "enough proof" of what actually happened, that "no matter how many times you hit us with that story 'I was in a struggle,' we know that's not what happened, we know."

The statements of the accused, the admission of which she did not challenge, showed that for about six years she and the victim had lived together in a lesbian relationship with the victim assuming the dominant role. The placidity of the arrangement had come to be disturbed by the victim's excessive drinking, her use of marihuana and her interest in other women. The credibility of the accused was all important in the determination by the jury of the validity of her claim throughout the interrogations that she killed in self-defense. There is no doubt that the challenged comments of the police which were heard by the jury, whether in the form of questions, assertions of disbelief, opinions (not as expert witnesses), argument, recounting of what others were purported to have said contrary to the version of the accused, hearsay, or otherwise, tended to seriously prejudice the defense. We think that they did so improperly in the circumstances. Defense counsel made abundantly clear, time and time again, that he objected to the procedure under which the challenged matters went before the jury and to the substance of those matters.

The general rule, well settled in Maryland, is that "the trial judge has a wide discretion in the conduct of a trial and that the exercise of discretion will not be disturbed unless it has been clearly abused." *Bartholomey v. State,* 260 Md. 504, 530, 273 A. 2d 164 (1971). *See Plank v. Summers,* 203 Md. 552, 554-555, 102 A. 2d 262 (1954). The principle that the overall direction of the trial is within the sound discretion of the trial judge encompasses the admission of evidence. *Boblits v. State,* 7 Md. App. 391, 400, 256 A. 2d 187 (1969), *cert. denied,* 256 Md. 743 (1970); *Tomolillo v. State,* 4 Md. App. 711, 716, 245 A. 2d 94 (1968); *Koprivich v. State,* 1 Md. App. 147, 153, 228 A. 2d 476 (1967). *Cf. Nizer v. Phelps,* 252 Md. 185, 198, 249 A. 2d 112 (1969); *Sanner v. Guard,* 236 Md. 271, 277, 203 A. 2d 885 (1964). But even though a trial judge, as the judge here early in the trial declared, "runs the court," the right of an accused to a fair trial, although not a perfect trial, is paramount. *Bruton v. United States,* 391 U. S. 123, 135, 88 S. Ct. 1620 (1968); *Lutwak v. United States,* 344 U. S. 604, 619, 73 S. Ct. 481 (1953). "A fair trial in a fair tribunal is a basic

requirement of due process [guaranteed by the Fourteenth Amendment to the federal constitution.]"[3] *In re Murchison,* 349 U. S. 133, 136, 75 S. Ct. 623 (1955).

> Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the *probability* of unfairness. [*Id.* (emphasis added).]

The Court said in *Tumey v. Ohio,* 273 U. S. 510, 532, 47 S. Ct. 437 (1927): "Every procedure which would offer a possible temptation to the average man . . . not to hold the balance nice, clear and true between the State and the accused denies the latter due process of law." "[To] perform its high function in the best way 'justice must satisfy the appearance of justice.' " *Murchison* at 136, quoting *Offutt v. United States,* 348 U. S. 11, 14, 75 S. Ct. 11 (1954). *Accord, Estes v. Texas,* 381 U. S. 532, 543, 85 S. Ct. 1628 (1965).

> The aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence whether true or false. . . .
> As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevent a fair trial. . . . [*Lisenba v. California,* 314 U. S. 219, 236, 62 S. Ct. 280 (1941).]

*See Blackburn v. Alabama,* 361 U. S. 199, 206, 80 S. Ct. 274 (1960).

---

3. "[N]or shall any State deprive any person of life, liberty, or property, without due process of law. . . ." U.S.Const. amend. XIV, § 1.

The phrase "due process of law" in the federal constitution has been equated with the phrase "Law of the land" in the Maryland Constitutional declaration that "no man ought to be . . . deprived of his life, liberty or property, but . . . by the Law of the land." Md. Const. Declaration of Rights, Art. 24 (formerly Art. 23). Horace Mann League v. Board, 242 Md. 645, 685, 220 A. 2d 51, *cert. denied,* 285 U. S. 97 (1966).

In the particular circumstances of this case, we believe that the placing before the jury of the challenged portions of the interrogations did not meet the "civilized standards for a fair and impartial trial." *Madison v. State,* 205 Md. 425, 434, 109 A. 2d 96 (1954). To permit the jury to hear them failed to observe that fundamental fairness essential to the very concept of justice and was "inconsistent with the rudimentary demands of fair procedure," *see United States v. Timmreck,* 441 U. S. 780, 784, 99 S. Ct. 2085 (1979), as related "to the overall fairness of the trial considered in its entirety," *see Kentucky v. Whorton,* 441 U. S. 786, 788, 99 S. Ct. 2088 (1979). We find that the absence of that fairness fatally infected the trial. Therefore, the accused was deprived of her liberty without due process of law and is entitled to a new trial.

It is plain that in light of the trial judge's comments in consistently overruling defense counsel's persistent and emphatic objections to the challenged portions of the interrogations that he accepted that they were not properly to be considered by the jury and that the putting of them to the jury was in actuality erroneous. It is equally clear, however, that he believed that his cautions to the effect that the jury were "not to pay any attention to the context of a question, except insofar as it provokes an answer," satisfied him that the jury would not "pay any attention to the questions of the interrogator" and thus cured the error. The State follows this notion on appeal, urging that "any error was cured by the trial judge's instructions to the jury." [4]

---

4. The trial judge's instructions to the jury at the close of all the evidence made no mention of the recordings. But early in the charge he said:

> During the course of a trial, a judge makes rulings, and he makes comments, and I am sure that every human being is fallible and makes gestures or remarks or gives other indications of feelings, and if I have done that in any fashion, I want you to disregard the remarks made in connection with rulings, disregard the rulings themselves, disregard any expression, verbal or otherwise, that you might feel that you have detected from the Court. I want you to — I implore you to disregard everything but the exhibits that will be given to you when you retire to deliberate and the sworn evidence that you have heard from the witness stand. Remember that you decide this case based solely on the evidence in the case.

Our predecessors stated the rule regarding an instruction for the jury to disregard certain matters in *Nelson v. Seiler*, 154 Md. 63, 72, 139 A. 564, 567 (1927):

> Generally, the choice of measures to protect the fair, unprejudiced, working of its proceedings is left to the discretion of the trial court, and only in exceptional cases will its choice be reviewed in this court. In the greater number of instances the injection into a trial of matter other than that involved in the issue to be decided is cured by withdrawal of it and an instruction to the jury to disregard it, but there may, of course, be instances in which it would not be cured in this way, and terminating the trial and taking the case up afresh before another jury would be the only adequate means of correction. Those instances are exceptional, but they do arise. [citing cases.]

In *Lusby v. State,* 217 Md. 191, 141 A. 2d 893 (1958) there was placed before the jury that lie detector tests had been made and were favorable to the state's case. Prescott, J. dissented to the majority's affirmance of the judgment because he thought that an instruction to the jury to disregard this information was ineffective. He stated his view vividly:

> Theoretically it may be said that the defendant was not denied a fair and impartial trial, because the

And later after discussing the law of self-defense, the judge told the jury:

The Court has dealt specifically with a definition of self-defense, and the law applicable thereto, because there is testimony in the case concerning that matter. The Court has pointed out to you not to hold it against the defendant or draw any inference by virtue of her exercising her constitutional right to remain silent. You must be convinced unanimously beyond a reasonable doubt and to a moral certainty of guilt before you can return a guilty verdict. You are to consider only the exhibits that have been received into the case, the evidence that you have heard from the witness stand, and you may disregard everything that I have told you, for my instructions are only advisory.

The tapes and the transcript of them in their entirety had been admitted as exhibits.

court instructed the jury to disregard the objectionable evidence; but the Courts should exercise at least a reasonable amount of practicality in the rendition of their judgments. In a situation of the kind we have in the instant case, can it be said that the court's admonition to the jury to disregard the references to the fact that lie detector tests had been made was effective in erasing the impression made upon the minds of the jury by the state's attorney that such tests had been made and the results were favorable to the state's case? Empirically speaking, it was about as effective as informing a three year old child, who has just received a handful of lollypops from a large, jolly, rotund, white-whiskered man dressed in red as he alighted from a sleigh drawn by eight reindeer, that there was no such personage as Santa Claus. [*Id.* at 207, Prescott, J. dissenting.]

*See Bruton v. United States,* 391 U. S. at 129-130; *Jackson v. Denno,* 378 U. S. 368, 388, n. 15, 84 S. Ct. 1774 (1964); *Delli Paoli v. United States,* 352 U. S. 232, 247-248, 77 S. Ct. 294 (1957) (Frankfurter, J. dissenting); *Krulewitch v. United States,* 336 U. S. 440, 453, 69 S. Ct. 716 (1949) (Jackson, J. concurring).

The case before us furnishes one of the exceptional instances in which a caution to disregard is not sufficient to cure the error in placing improper matters before the jury. It is a classic illustration of an instance in which such error can be adequately cured only by terminating the trial and taking the case up afresh before another jury. The nature of the objectionable matter, the constant repetition of it before the jury, and its direct adverse relation to the defense of the accused, lead inescapably to this conclusion. We observe that none of the matters to which the defense's continual objections went was actually stricken or withdrawn from the jury other than by the caution to disregard them; the challenged matters remained in the transcripts of the recording given to the jury and on the tapes, both of which

were in the case as exhibits. We hold that in the circumstances the error was not cured by the cautionary instructions.

We give short shrift to the State's contentions that the accused "waived objections to the evidence in question," and that "even if the evidence was erroneously admitted, it was harmless error." As we have indicated, defense counsel was vigorous, persistent and steadfast in his objections. Patently, he did not intend to waive these objections by his attempts on cross-examination, including the offering of the deposition referred to in the recordings, to salvage what he could and mitigate to some extent the adverse rulings of the court. *See Peisner v. State,* 236 Md. 137, 144, 202 A. 2d 585 (1964); *Jones v. State,* 205 Md. 528, 536, 109 A. 2d 732 (1954); *MacEwen v. State,* 194 Md. 492, 504-505, 71 A. 2d 464 (1950).

In this State

> when an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of — whether erroneously admitted or excluded — may have contributed to the rendition of the guilty verdict. [*Dorsey v. State,* 276 Md. 638, 659, 350 A. 2d 665 (1976).]

Upon our own independent review of the record, we are unable to declare, in the circumstances here, such a belief, nor can we be satisfied that there is no reasonable possibility that the challenged portion of the recordings may have contributed to the rendition of the guilty verdict.

Inasmuch as the errors with respect to placing the challenged portions of the recordings of the interrogations before the jury were not cured by the trial judge, waived by the accused, or harmless, the judgment is reversed and a new trial is awarded. As the appeal is decided against the State

in favor of the appellant who was represented by the office of the Public Defender, we do not reallocate the costs as part of the judgment of this Court. Md. Rule 882 f.

> *Judgment reversed; case remanded for a new trial; costs are not reallocated as part of the judgment of this Court pursuant to Maryland Rule 882 f.*