962 A.2d 440

**Tony WILLIAMS**

**v.**

**STATE of Maryland.**

**No. 999, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Dec. 24, 2008.

518

Gary B. Bair (Daniel H. Ginsburg, Bennett & Bair, LLP on the brief), Greenbelt, for appellant.

Cathleen C. Brockmeyer (Douglas F. Gansler, Attorney General on the brief), Baltimore, for appellee.

Argued before KRAUSER, C.J.,* ADKINS, SALLY D. and CHARLES E. MOYLAN, JR. (Ret., Specially Assigned), JJ.

---

* Sally D. Adkins, now serving on the Court of Appeals, participated in the hearing and conference of this case while an active member of this Court; she participated in the adoption of this opinion as a specially assigned member of this Court.

**KRAUSER, C.J.**

In February 1998, Tony Williams, appellant, was convicted by a jury in the Circuit Court for Baltimore City of first-degree murder, the use of a handgun in the commission of a crime of violence, and carrying a handgun in the fatal shooting of Dana Drake. When his convictions were upheld by this Court, appellant filed a petition for post-conviction relief. That petition was denied by the circuit court. We, however, reversed that decision and remanded the case for a new trial, because the prosecution, in our view, had failed to disclose to the defense material impeachment evidence. *Williams v. State,* 152 Md.App. 200, 831 A.2d 501 (2003). The Court of Appeals affirmed. *State v. Williams,* 392 Md. 194, 896 A.2d 973 (2006).

In April 2007, almost nine years after his first trial, Williams was again convicted of the same offenses. Appealing those convictions once more, he presents four questions for our review:

I. Did the circuit court err by not dismissing appellant's indictment with prejudice, given the prosecution's repeated *Brady* violations in this case?

II. Did the circuit court err in admitting a videotape of the prior testimony of Brenda O'Carroll, a key State's witness who died before appellant's second trial, where the prosecution withheld evidence that O'Carroll was legally blind?

III. Did the circuit court err in denying appellant's motion to suppress statements that he allegedly made to informant Sean Williams while they were jailed together, where the informant secretly interrogated appellant about the decedent's murder and tried to use his cooperation with the police in order to obtain a lower sentence?

IV. Did the circuit court err by failing to strike the testimony of a homicide detective who opined that the

evidence established appellant's guilt beyond a reasonable doubt?

For the reasons set forth below, we shall affirm.

## Facts

The facts of this case have been set forth by this Court in two separate opinions and by the Court of Appeals in one. We need not now engage in another lengthy recounting of all the evidence presented at appellant's retrial when a brief summary of that evidence will more than satisfy the demands of this appeal.

Dana Drake, the victim, was shot and killed with a .22 caliber gun on February 21, 1998, at approximately 3:00 a.m. About an hour-and-a-half later, appellant, who, at that time, was the victim's fiancé, called the police to report the shooting. He asked them to meet him at a location not far from the victim's apartment building. Driving a red Corvette and dressed in black, he led the police to the victim, who was lying dead in the stairwell of her apartment house. Appellant told police at the scene that Ms. Drake had an "estranged relationship" with another man and that that man had threatened to hurt her.

Two neighbors of the victim, Shannond Fair and Brenda O'Carroll, heard gunshots at approximately 3:00 a.m. on the day that the victim was murdered. Shannond Fair looked out his window after hearing "more than one" gunshot and, though it was "pitch dark" outside, saw somebody in black clothing running from the scene. Brenda O'Carroll was able to provide more details, but not in person. A videotape of her testimony at appellant's first trial was played for the jury, as she had passed away before the commencement of appellant's retrial. She claimed to have seen appellant get out of a red Corvette, chase the victim into the apartment building, and fire two shots at her. After she heard a third shot, she saw appellant run from the building and jump into his car. She then opened her door and saw the victim sitting on the third step of the stairway leading to the next floor, "with her head

on the side, dead." Appellant subsequently admitted to police that he had previously purchased a .22 caliber handgun. And then, anticipating the results of a gunshot residue test he had undergone, he informed them that "he had fired a handgun earlier that day at a gun range." Later, however, he changed his story, stating that he had accidentally fired a gun that evening.

After his arrest and while incarcerated at the Baltimore City Detention Center, appellant confided to a fellow inmate, Sean Williams, that he had shot the victim and that he had done so to obtain the proceeds from an insurance policy. Less than two years earlier, he and the victim had purchased a $100,000 life insurance policy with a spousal rider providing that, if the victim died, appellant was to receive the proceeds of the policy. Appellant was, at the time of the shooting, over $90,000 in debt. Appellant further told Sean Williams that he intended to blame the shooting on another man whom the victim was seeing.

After his first trial, appellant was convicted of first-degree murder, the use of a handgun in a crime of violence, and carrying a handgun. Those convictions were overturned and a new trial was ordered because the State had failed to inform appellant, as required by *Brady v. Maryland*, that Sean Williams had been a registered, paid police informant. Before the new trial was to take place, Detective Sergeant Darryl Massey testified at a suppression hearing that Ms. O'Carroll, now deceased, had told him that she was legally blind at the time of the murder and that he had observed behavior that suggested her sight was impaired. This information had not been previously disclosed to appellant.

In a series of motions that followed, appellant requested that Ms. O'Carroll's videotaped testimony be excluded or, in the alternative, that portions of her testimony, regarding what she claimed to have seen, be redacted; that the statements he had made to Sean Williams be suppressed; and, further, that the indictment be dismissed for multiple *Brady* violations. All of these motions were denied.

### Discussion

#### I.

Appellant contends that the circuit court erred in failing to dismiss appellant's indictment with prejudice for what he describes as "repeated" *Brady* violations by the State. But, he cites only two such violations, and both occurred before appellant's first trial. They were: the State's failure to inform the defense that Sean Williams had been a paid police informant and the failure of Detective Sergeant Massey to disclose Ms. O'Carroll's self-described "legal blindness." The failure of the State to inform appellant of Sean Williams' status was the basis for granting appellant a second trial.

At a hearing after his first trial, but more than a month before his second, Detective Sergeant Massey mentioned for the first time that, when he spoke to Ms. O'Carroll, she told him that she was legally blind. At that time, he also observed that "[h]er demeanor was consistent with someone who may have a sight imparity [sic]." This information was thus revealed to appellant before his second trial, and, during that trial, he made use of it in opening statements, in the cross-examination of Detective Massey, and in closing argument.

To bolster his argument that dismissal was an appropriate remedy for the two *Brady* violations, appellant quotes the following language from *Government of the Virgin Islands v. Fahie*, 419 F.3d 249, 255 (3d Cir.2005): "[W]here a defendant shows both willful misconduct by the government and prejudice, dismissal may be the appropriate sanction for a *Brady* violation." The State responds that, first, there were not two *Brady* violations, but one, because Detective Massey's failure to disclose Ms. O'Carroll's eyesight problem was not a *Brady* violation. And second, even if Detective Sergeant Massey's lack of disclosure was a *Brady* violation, both violations were cured by the advent of the second trial and do not warrant dismissal of the indictment with prejudice.

 "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching;

that evidence must have been suppressed by the State, either wilfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 282–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). "Suppression contemplates the ultimate concealment of evidence from the jury. . . ." *DeLuca v. State,* 78 Md.App. 395, 424, 553 A.2d 730 (1989). In other words, "[t]he *Brady*[*v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)] sin is in hiding something and keeping it hidden. . . ." *Id.* Therefore, a late disclosure of *Brady* material, even "very near the time of trial," does not necessarily constitute "suppression" and, hence, a *Brady* violation. *Bloodsworth v. State,* 76 Md.App. 23, 43 n. 16, 543 A.2d 382 (1988) (holding that disclosure of exculpatory evidence twelve days before trial was not a suppression of evidence under Brady ).

■ Ms. O'Carroll's assertion that she was "legally blind" was not kept "hidden" but was actually disclosed by Detective Sergeant Massey well in advance of appellant's second trial. Consequently, although the concealment of that evidence was arguably a *Brady* violation at the time of the first trial, it was no longer a *Brady* issue at the time of the second. In short, the *Brady* problem as to this piece of evidence was resolved by the granting of the second trial.

■ Indeed, the provision of a new trial is the standard remedy for a *Brady* violation, for the simple reason that evidence, which was initially suppressed, can then be presented to a new jury. *See California v. Trombetta,* 467 U.S. 479, 486–87, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) (observing that "[i]n nondisclosure cases, a court can grant the defendant a new trial at which the previously suppressed evidence may be introduced"); *United States v. Davis,* 578 F.2d 277, 280 (10th Cir.1978) (holding that "a violation of due process under *Brady* does not entitle a defendant to an acquittal, but only to a new trial in which the convicted defendant has access to the wrongfully withheld evidence").

That being so, we have no reason to now depart from this well-settled approach to curing such violations. In the instant case, there were two pieces of impeachment evidence that the

State did not disclose to appellant prior to the first trial: 1) that Sean Williams was a paid informant in other cases for the Baltimore City Police and 2) that Ms. O'Carroll told Detective Sergeant Massey that she was legally blind and that Detective Sergeant Massey observed, at that time, behavior in Ms. O'Carroll that suggested a sight impairment. Because this evidence was disclosed before appellant's second trial, he was free to use it at that proceeding.

We, of course, agree that appellant's situation was clearly complicated by Ms. O'Carroll's death. She died after testifying at appellant's first trial and her purported legal blindness was not disclosed until after her death. But, as we noted previously, "the *Brady* sin is hiding something and keeping it hidden," *DeLuca v. State,* 78 Md.App. 395, 424, 553 A.2d 730 (1989), and the remedy for that transgression is disclosure. The intervening death of Ms. O'Carroll, while unfortunate, does not create a *Brady* problem. What it does do, however, is raise evidentiary and constitutional issues. To be more precise, whether the circuit court was correct in admitting the videotaped testimony of Ms. O'Carroll, given the appellant's inability to ask her about her "legal blindness," is an evidentiary and constitutional question separate and apart from the question of a *Brady* violation, and that issue we will address in the next section of this opinion.

## II.

Appellant contends that the court's admission, at appellant's second trial, of Brenda O'Carroll's videotaped testimony from the first trial violated Rule 5–804(b)(1) of the Maryland Rules of Evidence and the Sixth Amendment because he did not have the opportunity to cross-examine Ms. O'Carroll about her statement that she was legally blind.

The State counters that, because appellant did have the opportunity to cross-examine Ms. O'Carroll at his first trial and because he had a similar motive to develop Ms. O'Carroll's testimony at both his first and second trials, her videotaped testimony was properly admitted under Rule 5–804(b)(1). It

further points out that appellant was free at his second trial to cross-examine Detective Sergeant Massey about Ms. O'Carroll's statement; that, in fact, he did; and that he was granted permission by the court to supplement the record with medical records or whatever other evidence could be found to establish that Ms. O'Carroll had impaired vision and then to later argue to the jury that it must consider her observations in light of that evidence.

Rule 5–804(b)(1) provides:

> The following [is] not excluded by the hearsay rule if the declarant is unavailable as a witness: (1) Former Testimony. Testimony given as a witness in any action or proceeding ..., if the party against whom the testimony is now offered ..., had an ***opportunity and similar motive*** to develop the testimony by direct, cross, or redirect examination.

(Emphasis added.)

■■■ Each of the Rule's elements must be satisfied before a court may admit former testimony. *United States v. Salerno*, 505 U.S. 317, 321, 112 S.Ct. 2503, 120 L.Ed.2d 255 (1992). The opportunity for cross-examination required by Rule 804(b)(1) "is generally satisfied when the defense is given a full and fair opportunity to probe and expose [the] infirmities [of a witness' testimony] ... thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony." *United States v. Salim*, 855 F.2d 944, 954 (2d Cir.1988) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 22, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (per curiam)). The courts that have addressed the issue have found sufficient opportunity for cross-examination where the witness in question was cross-examined at a previous proceeding. *See, e.g., United States v. Avants*, 367 F.3d 433, 444 (5th Cir.2003) ("Obviously, [defendant's] attorney had the requisite opportunity to cross-examine [the witness] at [defendant's] preliminary hearing in 1966; he actively did so."); *United States v. Reed*, 227 F.3d 763, 768 (7th Cir.2000) (finding sufficient opportunity where witness was cross-examined at defendant's

first trial); *United States v. Salim,* 855 F.2d 944, 953–54 (2d Cir.1988) (finding sufficient opportunity even where questions were required to be submitted in writing); *People of the Territory of Guam v. Hayes,* 1993 WL 469357, at *3 (D.Guam, Oct. 12, 1993) (finding sufficient opportunity where witness was cross-examined at defendant's first trial).

■ While appellant certainly had the opportunity to cross-examine Ms. O'Carroll at his first trial, the opportunity to examine is not enough. According to Rule 5–804(b)(1), appellant must also have had, at that time, a similar motive to develop the testimony. A similar motive, we caution, is not necessarily an identical one. *See Murray v. Toyota Motor Distributors, Inc.,* 664 F.2d 1377, 1379 (9th Cir.1982).

This Court applied the "similar motive" requirement of Rule 5–804(b)(1) in *Forrest v. P & L Real Estate Investment Company,* 134 Md.App. 371, 759 A.2d 1187 (2000). In that case, Robert Forest and Stacie Brown (whom we shall refer to collectively as the "Forests") brought an action on behalf of their two children against their landlord and the landlord of their uncle and aunt, Clinton and Heidi Elliot, for injuries their children sustained as a result of exposure to lead-based paint that was found in both their apartment and in the Elliots' apartment. *Id.* at 376, 378, 759 A.2d 1187. Before the Forests' suit was filed, however, Clinton Elliot was deposed by his landlord as the Elliots had brought the same type of action on behalf of their own children. *Id.* at 379, 759 A.2d 1187.

Because Mr. Elliot died before the Forests' case went to trial, the Forests sought, at trial, to introduce Mr. Elliot's deposition testimony, particularly his statements that the Forests and their children had visited his apartment, that there was deteriorated paint in his apartment, and that he had given his landlords notice of that fact. *Id.* at 380, 759 A.2d 1187. The landlords' objections to the testimony were sustained, and the deposition was excluded. *Id.*

■ When the jury returned a defense verdict, the Forests appealed, raising this issue. *Id.* We held that, because the visits of the Forests' children to the Elliots' apartment were

not an issue at the time the deposition was taken (the Forests had not yet filed their complaint), the Elliots' landlord had no motive to cross-examine Mr. Elliot as to that issue. *Id.* But, we reached an entirely different result with respect to Mr. Elliot's testimony that he notified his landlords of the deteriorated paint. We pointed out that because the existence of the deteriorated paint and the landlords' notification of it were central issues in the suit between the Elliots and their landlord, the landlords' motive for cross-examining Mr. Elliot on that point would have been the same at both trials. *Id.* at 381–82, 759 A.2d 1187. We reach a similar conclusion here.

At his first trial, appellant had good reason to question Ms. O'Carroll about her eyesight, given that, as Shannond Fair put it, it was "pitch dark" outside at the time of the murder and Ms. O'Carroll's complicated health history. As to that history, the defense was alerted early on that O'Carroll had significant medical problems. In fact, the State's direct examination of Ms. O'Carroll began with a brief inquiry into her current state of health and "any medicines" she might be currently taking.

That exchange disclosed that she was presently taking "medicine" and receiving radiation treatment. Later, on cross-examination, she volunteered that she had not spoken with police since the incident because she had been "hospitalized" and then added, without prompting, that she had had "eleven operations." Yet, even after Ms. O'Carroll indicated how serious her health problems were and how complicated her medical history was, the defense did not question her as to the nature of these problems and the medications she was currently taking.

Had the defense done so, there is no reason to believe that she would not have disclosed that she was currently suffering from, among other things, diabetes, an ailment which can lead to blindness.[1] Indeed, had the subject of her eyesight been raised at all, there is no reason to believe she would not have

---

1. Diabetes "can lead to processes that cause blindness." *The Merck Manual* 1110 (16th ed.1992).

informed the defense, as she had Detective Massey, that she was legally blind.

In any event, that appellant's counsel chose not to question her at all about her eyesight does not alter the fact that he had a motive to do so. *See United States v. McClellan,* 868 F.2d 210, 215 (7th Cir.1989) ("The emphasis in this inquiry is upon the motive underlying the cross-examination rather than the actual exchange that took place.").

■ In determining the admissibility of the testimony of a witness from an earlier proceeding under Rule 5–804(b)(1), the issue is whether the party opposing admission had a similar motive to cross-examine that witness at the prior proceeding, not whether he, in fact, acted on that motive. This distinction has been drawn by other courts, notably by the United States Court of Appeals for the Fifth Circuit in *United States v. Avants,* 367 F.3d 433 (5th Cir.2004). Avants had first been prosecuted for murder in state court in 1967 and acquitted. *Id.* at 439–40. But, in June 2000, he was indicted on federal charges because the murder took place in a national forest. *Id.* at 440.

At his 2003 trial, the court admitted the 1966 preliminary hearing testimony of a witness who had since died. *Id.* Avants was convicted. *Id.* On appeal, he argued that the preliminary hearing testimony should not have been admitted because his motive for impeaching the witness in 1966 was different from his motive for doing so in 2003. *Id.* at 444. The Fifth Circuit disagreed, stating:

> [A]t his 2003 federal trial, [defendant] may have had to discredit [the witness] on more elements than he did at the 1966 state preliminary hearing. But, particularly where the scope of [defendant's] state prosecution does not appear in the record, we can only conclude that, ***in both situations, his motive was to discredit a witness [ ] whose testimony could, if believed, convict him* .... *The matters on which [defendant] was to be discredited were a matter of trial strategy, which do not make motive dissimilar.***

*Id.* at 444 (citing *United States v. Tannehill*, 49 F.3d 1049, 1057 (5th Cir.1995)) (emphasis added).

The *Avants* decision mirrored an earlier decision of the same federal appellate court in *Tannehill.* In that case, the Fifth Circuit examined whether there was a similar motive for cross-examination when different counsel with different defense theories cross-examined the same Government witness at the defendant's first trial. *Tannehill*, 49 F.3d at 1057. Tannehill and six others were charged with engaging in a fraudulent real estate scheme. *Id.* at 1050–51. All of those charged were originally tried together, but after a mistrial was declared, Tannehill was tried separately. *Id.* at 1051. At his second trial, the court admitted, under Rule 804(b)(1), the prior trial testimony of the aforementioned Government witness, who by that time had died, and Tannehill was convicted. *Id.* at 1051, 1057.

On appeal, Tannehill claimed that the court erred in admitting the testimony of that witness. He explained that "his motive for cross-examining the witness at the [first] trial was sufficiently different ... because he was one of seven defendants at that trial, almost all of the cross-examination of the witness was conducted by counsel for his co-defendants, and his [strategy at the first trial] 'was to disappear into the woodwork and hope for the best.'" *Id.* at 1057. Rejecting that argument, the court stated: "Although [Tannehill]'s 1993 trial strategy may have changed because he was being tried alone, his motive for cross-examination was the same as in [his first] trial: to discredit the witness and separate himself from the other members of the conspiracy." *Id.*

Like the defendants in *Avants* and *Tannehill*, appellant's cross-examination motive did not change from the first proceeding to the last but remained the same. Appellant's motive for cross-examining Ms. O'Carroll at his second trial was no different from what it was at his first trial: to cast doubt on her claim that she saw what she claimed to have seen, that is, that she observed appellant chase and shoot at the victim and then run and jump into his car. As we previously pointed out,

had appellant, at his first trial, cross-examined Ms. O'Carroll as to the condition of her eyesight, there is no reason to believe that she would not have stated that she was legally blind. In any event, that information was supplied to the jury by Detective Sergeant Massey's testimony. And, defense counsel made use of that information in opening statement and closing argument.

Finally, we note that we need not make an independent inquiry into appellant's Sixth Amendment claim because our finding that the testimony was properly admitted under Rule 5–804(b)(1) is necessarily predicated on a determination that appellant had a prior opportunity to cross-examine Ms. O'Carroll. *See Avants,* 367 F.3d at 445 ("The qualities that made [the witness's] testimony admissible under 804(b)(1) make it meet *Crawford's* [Sixth Amendment] Confrontation Clause test: unavailability and a prior opportunity for cross-examination.") (citing *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)).

## III.

Appellant contends that the circuit court erred in denying his motion to suppress the statements he made to Sean Williams while he was incarcerated with Williams at the Baltimore City Detention Center. Specifically, appellant claims that Sean Williams was an agent of the State; that the State knew that he, appellant, was represented by counsel; and that, therefore, when Sean Williams elicited incriminating statements from him without counsel present, the State violated his Sixth Amendment right to counsel. The State claims, however, that Sean Williams was not a State agent when he elicited the information from appellant, and thus, no Sixth Amendment violation occurred.

" 'In reviewing the denial of a motion to suppress, we look only to the record of the suppression hearing and do not consider the evidence admitted at trial.' " *Charity v. State,* 132 Md.App. 598, 605, 753 A.2d 556 (2000) (quoting *In re Tariq A–R–Y,* 347 Md. 484, 488, 701 A.2d 691 (1997)). We

accept the findings of fact made by the circuit court unless they are clearly erroneous and otherwise review the evidence in the light most favorable to the prevailing party. *Conboy v. State,* 155 Md.App. 353, 361, 843 A.2d 216 (2004). But, we review *de novo* "all legal conclusions, making our own independent constitutional determination of whether ... appellant's statement was lawfully obtained." *Id.* at 361–62, 843 A.2d 216.

In *Maine v. Moulton,* 474 U.S. 159, 176, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985), the United States Supreme Court discussed the circumstances under which the admission of a statement made by an accused to a State agent, while outside the presence of counsel, violates the Sixth Amendment:

> [T]he Sixth Amendment is not violated whenever—by luck or by happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached. However ..., the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent.

Because "[d]irect proof of the State's knowledge will seldom be available to the accused," the *Moulton* Court noted that "proof that the State 'must have known' that its agent was likely to obtain incriminating statements from the accused in the absence of counsel suffices to establish a Sixth Amendment violation." *Id.* at 176 n. 12.

Following *Moulton,* we observed in *Garner v. State,* 142 Md.App. 94, 106, 788 A.2d 219 (2002):

> [T]he Sixth Amendment of the United States Constitution prohibits, absent a waiver, the admission of a statement by a criminal defendant when the statement is made (1) outside the presence of legal counsel; (2) in response to interrogation by the State; and (3) after the right to counsel has attached with respect to the charge being tried.

■ In this case, both parties acknowledge that appellant's statements to Sean Williams occurred outside the presence of legal counsel and after the right to counsel had attached.

Thus, the only issue that remains to be resolved is whether appellant's statements were made "in response to interrogation by the State."

The circuit court denied appellant's motion to suppress, finding that Sean Williams "land[ed] in central booking in proximity to [appellant] sort of serendipitously[,] without the knowledge or participation of the investigating officers," and that "he elicited voluntary statements from [appellant] in the hope of using them for his own benefit."

The testimony presented at the suppression hearing supports the circuit court's conclusion. Both Detective Gerald Hensley and Detective Sergeant Massey denied that Sean Williams was working for them at the time he was incarcerated with appellant. They also denied giving any instruction to Sean Williams to elicit incriminating information from appellant and denied promising Sean Williams anything for the information that he obtained. The officers' testimony was corroborated by Sean Williams, who stated that he was not working as an informant while he was incarcerated with appellant and that nobody asked him to gather any information or offered him anything for the information he ultimately provided. Given this testimony, the circuit court did not err in finding that Sean Williams acted without the knowledge or participation of the investigating officers.

Appellant, nonetheless, cites *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), for the proposition that, even if the State did not intend for Sean Williams to elicit incriminating information from appellant, the State's actions still violated the Sixth Amendment because the State "must have known" that Sean Williams was likely to do so. In *Henry*, the question was "whether, under the facts of th[at] case, a Government agent 'deliberately elicited' incriminating statements from [the accused]." *Id.* at 270, 100 S.Ct. 2183. There, a paid informant for the FBI told an FBI agent that he was housed in the same cellblock with Henry, who had been charged with bank robbery and was awaiting trial. *Id.* at 266, 100 S.Ct. 2183. The agent told the informant to be

alert to any statements made by Henry but not to initiate any conversation with Henry or question him. *Id.* After the informant was released from prison, the agent contacted the informant, who reported that Henry had told him about the robbery. *Id.* The informant was subsequently compensated for that information. *Id.*

"By intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government," the Supreme Court held, "violated Henry's Sixth Amendment right to counsel." *Id.* at 274, 100 S.Ct. 2183. In reaching that conclusion, the *Henry* Court considered three factors: "First, [the informant] was acting under instructions as a paid informant for the Government; second, [the informant] was ostensibly no more than a fellow inmate of Henry; and third, Henry was in custody and under indictment at the time he was engaged in conversation by [the informant]." *Id.* at 270, 100 S.Ct. 2183.

Applying these factors, it is clear that the court below did not err in failing to find that Sean Williams was acting as an agent of the State when he obtained inculpatory statements from appellant. The evidence presented at the suppression hearing showed that Sean Williams was not acting under instructions from either Detective Hensley or Detective Sergeant Massey when he elicited the statements at issue from appellant at the detention center. The evidence also showed that neither of the officers were even aware that Sean Williams would have access to appellant or would have the opportunity to engage him in conversation. Finally, the evidence showed that Sean Williams was neither paid nor promised anything for the information he provided.

## IV.

Appellant finally contends that the circuit court abused its discretion in refusing to strike Detective Sergeant Massey's trial testimony because "he twice expressed his belief to the jury that the evidence established Appellant's guilt beyond a reasonable doubt." Appellant cites several cases

for the proposition that "an investigating officer's opinion that a defendant is guilty is inadmissible in evidence." *See Crawford v. State,* 285 Md. 431, 451, 404 A.2d 244 (1979); *Casey v. State,* 124 Md.App. 331, 339, 722 A.2d 385 (1999); *Snyder v. State,* 104 Md.App. 533, 554, 657 A.2d 342 (1995).

During the cross-examination of Detective Sergeant Massey at trial, appellant attempted to elicit information regarding Sean Williams' cooperation in the investigation of another murder case. That effort prompted the following exchange:

Q: Mr. Sean Williams never testified [in the other case] did he?

A: No, because the facts in that case in the preponderance of the evidence that existed, Mr. Williams was not needed, was not needed let alone the defendant. One of the co-defendant [sic] Ratchford provided enough information that he hung himself.

Q: Sir you used the word preponderance of the evidence. You understand that the State's burden is beyond a reasonable doubt, don't you?

A: And that's certainly what we have here.

Q: Where? Where? In this case. You said here.

A: Yes.

Q: I move to strike his entire testimony. That was gratuitous. It was outrageous.

\* \* \*

Court: I'm not striking his testimony. You don't want me to strike his testimony.

Q: It's gratuitous. He said that he's guilty.

Because Detective Sergeant Massey's comment, during this exchange, appears to be no more than an expression of agreement that the State's burden of proof, in the instant case, was proof beyond a reasonable doubt, we conclude that the circuit court did not abuse its discretion in refusing to strike Detective Sergeant Massey's testimony based on this comment.

538

JUDGMENTS AFFIRMED.
COSTS TO BE PAID BY APPELLANT.