759 A.2d 1187

**Brittany FORREST, et al.**

v.

**P & L REAL ESTATE INVESTMENT COMPANY et al.**

**No. 2324, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

Oct. 2, 2000.

374

Alan J. Mensh (Saul E. Kerpelman and Saul E. Kerpelman & Associates, P.A., on the brief), Baltimore, for appellants.

Laura Maroldy (Gertrude C. Bartel and Kramon & Graham, P.A., on the brief), Baltimore, for appellees, Poff and P & L Real Estate.

Frank F. Daily (Cynthia Dietz Spirt, on the brief), Hunt Valley, for appellees Frank Murphy, et ux.

Argued before MOYLAN, EYLER and KENNEY, JJ.

EYLER, Judge.

This is an appeal by plaintiffs-appellants from a judgment in favor of defendants-appellees after a trial by jury in the Circuit Court for Baltimore City. Appellants sought compensa-

tion for injuries sustained as a result of exposure to lead-based paint. The complaint was filed on December 30, 1997, and the case was tried on September 14 to September 17, 1999. Appellants' claims are on behalf of Brittany and LaTisha Forrest, both minors, and appellees are P & L Real Estate, Leslie Poff, Ruth Murphy, and Frank Murphy. Appellants claimed exposure to lead-based paint at premises located at 2507 Madison Avenue owned by P & L Real Estate and Leslie Poff and at premises located at 2501 Madison Avenue owned by the Murphys. The causes of action against P & L Real Estate and Poff were violation of the Consumer Protection Act ("CPA"), Md.Code (1975, 1990 Repl.Vol.) Title 13 of the Commercial Law Article, and negligence, and the cause of action against the Murphys was negligence.

Appellants raise three issues, all of which are related to the conduct of the trial. Consequently, there is no need for us to elaborate on the procedural history of the parties and the claims.

### Facts

Brittany Forrest, born on April 17, 1990, and LaTisha Forrest, born on July 22, 1991, claim damages for injuries sustained as a result of exposure to lead paint in 1992 and 1993. The minors' parents are Stacie Brown and Robert Forrest.

The parents and Brittany began residing at 2507 Madison Avenue, Apt. 2B, in November, 1990. The property was owned by P & L Real Estate, a Maryland partnership. Leslie Poff was a general partner in P & L Real Estate and responsible for repair and maintenance of the building at 2507 Madison Avenue.[1] At the time of LaTisha's birth on July 22, 1991, the family moved to Apt. 3A, a larger apartment in the same building. There was testimony that Mr. Poff and Ernest Young, P & L's maintenance man, showed Apt. 3A to Mr.

---

1. There is no issue relating to the relationship between P & L Real Estate and Leslie Poff, and for purposes of this opinion, we will treat them as one.

Forrest. Mr. Poff and Mr. Forrest both testified that Apt. 3A was rented in "as is" condition. Mr. Forrest testified that there were areas of peeling and chipping paint at the inception of the lease, specifically around the windows. Stacie Brown's testimony was consistent with that of Mr. Forrest. The tenants and Mr. Poff agreed that the apartment would be rented "as is" and that Mr. Poff would supply paint to Mr. Forrest to paint the apartment and reduce the monthly rent. Mr. Poff did supply paint and reduced the monthly rent by $15, but Mr. Forrest, who testified that he was not aware that peeling paint was anything other than an esthetic issue, only painted certain walls.

The only complaint during the tenancy with respect to Apt. 3A was a complaint of a hole in the wall, and it was repaired. There was some dispute with respect to the frequency with which Mr. Poff visited Apt. 3A, but there was evidence that he was in the apartment prior to the lease and in the apartment once or twice during the tenancy. Mr. Poff testified that he went through the apartment before it was rented and that is how he knew it needed work, but stated that he did not see any deteriorated paint.

In May, 1992, the Baltimore City Department of Housing and Community Development inspected the apartment and noted (1) a defective smoke detector, (2) a defective wall in the living room, and (3) "missing or defective" plaster in the front bedroom. On February 4, 1993, the property was inspected by the Baltimore City Health Department, which identified 28 surfaces that tested positive for lead, including certain windows, doors, walls, and baseboards. The Health Department provided an abatement plan that provided for removal of loose materials in most of the areas, to "encapsulate or strip and restore" the exterior of middle room windows and front room windows, and to "restore or replace" middle room windows and front room windows, presumably interior.

Appellants also claim exposure to lead-based paint at 2501 Madison Avenue. Specifically, Ms. Brown testified that appellants visited their aunt and uncle, Clinton and Heidi Elliott, at

2501 Madison Avenue, Apt. 2–R, three or four times a week from March, 1992, to June, 1993. The property at 2501 Madison Avenue was owned by Frank and Ruth Murphy. The Elliotts had two children who were close in age to appellants. The Elliotts testified that they complained to the Murphys on multiple occasions with respect to peeling and chipping paint, which was denied by the Murphys. The Department of Housing & Community Development inspected the apartment on May 5, 1992, but did not note deteriorated paint. The Baltimore City Health Department inspected the apartment on March 23, 1993, and identified 63 surfaces in the apartment and the common areas for abatement.

Brittany was first diagnosed with an elevated lead level on April 7, 1992, and LaTisha was first diagnosed with an elevated lead level on December 4, 1992.

## Questions Presented

I. Did the trial court err as a matter of law in refusing to admit in evidence the deposition testimony of an unavailable witness?

II. Did the trial court err in instructing the jury that the tenant's agreement to paint an apartment precludes liability of the landlord under the Maryland Consumer Protection Act in a lead paint poisoning action?

III. Did the trial court err in declining to instruct the jury regarding constructive/alternative methods of notice, and stating that actual notice is required?

## Discussion

### I.

Prior to the filing of this suit, the Elliotts, on behalf of their children, filed suit seeking compensation for injuries sustained as the result of exposure to lead-based paint at the same two properties involved in the case before us. On March 10, 1997, before the complaint was filed in this case, Mr. Elliott was deposed. The deposition was noted by counsel for the Mur-

phys and was attended by counsel for the Elliotts and counsel for the third-party defendant, P & L Real Estate.

Mr. Elliott was deceased at the time of the trial in this case. Appellants attempted to introduce the deposition of Mr. Elliott, but an objection was sustained. Appellants argue that portions of the deposition were relevant, specifically, Mr. Elliott's testimony that appellants in this case visited the Elliotts in their apartment at 2501 Madison Avenue, his testimony that there was deteriorated paint in the Elliotts' apartment, and his testimony that notice had been given to the Murphys. Appellants argue that the deposition testimony added "new and more specific facts to the case" and "would have provided the jury with evidence against which to gauge the other testimony in this case."

■ We note that this issue relates to the liability of the Murphys only, who argue that when the Elliott deposition was taken, the visitation of appellants to the Elliott apartment was not an issue. Consequently, according to the Murphys, this does not involve the same subject matter under Rule 2–419, and there was no motive to cross-examine Mr. Elliott with respect to that visitation issue under Rule 5–804. Additionally, with respect to the evidence relating to notice of defects, the Murphys argue that it was cumulative because Ms. Elliott testified with respect to the presence of deteriorated paint in their apartment and that notice was given to the Murphys. Therefore, if exclusion of the testimony was error, the Murphys argue it was not prejudicial or reversible error.

It is undisputed that the witness was not available because he was deceased. *See* Rule 2–419(a)(3)(a). Rule 2–419(c) provides:

> A deposition lawfully taken in another action may be used like any other deposition if the other action was brought in any court of this state, of any other state, or of the United States, involved the same subject matter, and was brought between the same parties or their representatives or predecessors in interest.

The Court of Appeals, in *Huffington v. State*, 304 Md. 559, 569–74, 500 A.2d 272 (1985), endorsed the substance of Federal Rule of Evidence 5–804(b)(1) as the test for the admissibility of former testimony under the common law exception to the hearsay rule. In *Owens–Illinois, Inc. v. Zenobia*, 325 Md. 420, 439–41, 601 A.2d 633 (1992), the Court confirmed that the test for admissibility is whether a party had a motive to develop the testimony about the same matters in the action in which the deposition was taken as the present party would have in the action in which the deposition is being admitted. These actions predated adoption of the Maryland Rules of Evidence, which apply to trials commencing after July 1, 1994. In *U.S. Gypsum Co. v. Mayor & City Council of Baltimore*, 336 Md. 145, 647 A.2d 405 (1994), the Court stated that Rule 5–804(b)(1),[2] applicable to trials commencing after July 1, 1994, mirrors the language of the federal rule and, thus, codifies the motive test adopted in *Zenobia*. 336 Md. at 180 n. 14, 647 A.2d 405.

In the case before us, the deposition was being offered as evidence that appellants visited 2501 Madison Avenue. We agree with the Murphys that this was not an issue in the case in which the deposition was taken and, in fact, was not an issue at all because appellants' complaint had not been filed at that time. Consequently, it was not error to refuse to admit that portion of the deposition.

■ We reach a different conclusion with respect to the portion of the deposition relating to defects in the premises at 2501 Madison Avenue and notice of those defects to the

---

**2.** Rule 5–804(b) provides, in part:

(b) *Hearsay Exceptions.* The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(1) Former Testimony. Testimony given as a witness in any action or proceeding or in a deposition taken in compliance with law in the course of any action or proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

. . . .

Murphys. Those issues were involved in the case in which the deposition was taken, and the Murphys had an opportunity to examine the deponent with respect to those issues. Additionally, contrary to the assertion by the Murphys, the evidence was not merely cumulative. Ms. Elliott did testify with respect to the deteriorated paint in their apartment and that she had given notice to the Murphys. These matters were disputed, however. Mr. Elliott, in his deposition, stated not just that Ms. Elliott had given notice, but that he also had given notice of a deteriorated condition to the Murphys, both orally and in writing. Exclusion of this evidence was, therefore, an error. Additionally, we are unable to conclude that it was not prejudicial to the claim against the Murphys.

## II.

As stated previously, one of the issues decided by the jury was whether P & L Real Estate and Poff violated the CPA. As also observed earlier in this opinion, appellant, Brittany, resided at 2507 Madison Avenue in Apt. 2B. Subsequently, with the birth of LaTisha on July 22, 1991, the family moved to Apt. 3A. Although not expressly stated in the briefs, based on the transcript at trial and the arguments on appeal, the issue before us is limited to Apt. 3A.

Appellants excepted to the following jury instruction, which was part of the court's instructions to the jury with respect to the CPA claim. The court instructed the jury as follows:

Now because of certain testimony in this case, with respect to the agreement between the landlord and the tenants, with respect to painting, if you find that the responsibility for any defects in the condition of the paint at the beginning of the tenancy would have shifted as [a] result of this agreement from the landlord to the tenant, then of course then—then the landlord can't be held responsible if the landlord and tenant had an agreement that the tenant would paint the entire apartment including all areas which, if there are any, that have flaking paint. Including windows, wall-

boards, and all rooms that allegedly, by any testimony, have it.

Ms. Brown and Mr. Forrest testified that, at the time of leasing the apartment, they did not know of the hazards of lead poisoning to children. Mr. Poff testified that, prior to July, 1991, he was generally aware of the hazards of lead-based paint, that he was aware that it should not be used, and that he never used it.

Appellants argue that Mr. Poff rented an apartment to tenants who testified that they did not know about the danger of deteriorated paint and who repainted only a portion of the apartment. Appellants argue that P & L Real Estate and Poff had a duty to comply with the housing code and present the apartment to the tenants in a habitable condition, which duty could not be delegated to the tenant. Because of the failure to inform the tenants about the hazardous nature of deteriorated paint in the apartment, if the jury found there was deteriorated paint, there was arguably a material omission under the CPA. Finally, appellants argue that the tenant was acting as the agent of the landlord with respect to painting the apartment. Appellants conclude that the instruction as given did not permit the jury to consider the agency argument or failure to disclose argument.

P & L Real Estate and Poff observe that the court instructed the jury that, if the tenant agreed to paint the entire apartment including areas, if any, with deteriorated paint, the landlord was not liable under the CPA. Further, according to the instruction to the jury, in the absence of such an agreement, if deteriorated paint was present at the inception of the lease, then the jury should find for the tenants. Consequently, according to P & L Real Estate and Poff, there was no deception under the CPA if the jury found such an agreement, and the instruction was not error. Additionally, with respect to appellants' agency theory, P & L Real Estate and Poff argue that there was no evidence that Mr. Forrest was the agent of appellees for the purpose of painting the apartment.

Because of the nature of the issue, we believe it helpful to set forth in full the court's instructions to the jury with respect to the CPA. The instructions were as follows:

Now, when Mr. Poff and P and L, places an apartment in the stream of commerce for rental, the partnership and he is presumed to be familiar with all the conditions in the apartment. The law says that if I give you an apartment to rent, regardless of whether I know or don't know, the law says I must know what's in the apartment and everything— all the conditions that are there.

Whether I've examined it or not. In other words, that defendant is charged with the knowledge of everything true of the apartment. Including any negligent condition, if any should exist. The mere existence of flaking or chipping lead-based paint serves as notice of the condition and the landlord does not have to have actual notice of the condition of the property.

Therefore, if at the start of the lease, in this case, chipping and peeling lead-based paint was present at 2507 Madison Avenue, a violation of the Maryland Consumer Protection Act has occurred and you must find for the plaintiff as to that condition. If on the other hand if you find that those conditions were not present, of course, that there was not lead-based paint, and there is a dispute in this case, of flaking and chipping paint, now, keep in mind we're not talking about whether lead paint exists in the building or exists in the apartment. But whether it [was] chipping or flaking or in some condition like that that would [a]ffect or give the possibility of [a]ffecting somebody.

And you find that that wasn't true at the time that the apartment was leased, then there has been no violation of the Consumer Protection Act. And the Count—this Count would fail with respect to this defendant. Now do you understand that particular instruction?

A JUROR: Yes, sir.

THE COURT: Anybody not understand it? Everybody got it?

All right. Now because of certain testimony in this case, with respect to the agreement between the landlord and the tenants, with respect to painting, if you find that the responsibility for any defects in the condition of the paint at the beginning of the testimony would have shifted as [a] result of this agreement from the landlord to the tenant, then of course then—then the landlord can't be held responsible if the landlord and tenant had an agreement that the tenant would paint the entire apartment including all areas which, if there are any, that have flaking paint. Including windows, wallboards, and all rooms that allegedly, by any testimony, have it.

On the other hand, if you find that this was not such an agreement between the landlord and tenants, or that the agreement [was] uncertain, then you must go back and find out whether you find that there was or was not flaking or chipping paint in the apartment at the time of the rental.

If you do so find, then of course I'm instructing you to find for the plaintiff in this count. If you do not so find, then I would instruct you to find for the defendant. Do you understand that?

A JUROR: Yes, Your Honor.

THE COURT: In effect, what I'm saying is, you've got to find that the landlord and tenant have—had an agreement that—that the tenant was going to paint the whole apartment and get rid of any, if any, flaking and chipping paint. If there was not such an agreement, that it was some lesser sort of agreement, that did not include all these things that I've just said, then of course you must then go to the next set which would be the next set of my instructions to you is, you have to decide whether these things were there at the time the apartment was leased or were not there.

Jury understand that?

A JUROR: Yes, Your Honor.

■ We are presented with the task of determining the correctness of the trial court's instruction to the jury. As stated in *Benik v. Hatcher*, 358 Md. 507, 519, 750 A.2d 10

(2000), "the general rule regarding instructions to the jury has two aspects: (1) the instruction must correctly state the law, and (2) that law must be applicable in light of the evidence before the jury." (quoting *Sergeant Co. v. Pickett*, 285 Md. 186, 194, 401 A.2d 651 (1979)). Thus, "[i]t is well settled that if, when read as a whole, the court's instructions to the jury clearly set forth the applicable law, there is no reversible error." *Benik*, 358 Md. at 520, 750 A.2d 10 (citing *CSX Transp., Inc. v. Continental Ins. Co.*, 343 Md. 216, 240, 680 A.2d 1082 (1996)(citing *Nizer v. Phelps*, 252 Md. 185, 202–03, 249 A.2d 112 (1969)); *Alston v. Forsythe*, 226 Md. 121, 135, 172 A.2d 474 (1961)). The instruction in this case stated that P & L Real Estate and Poff could not be liable under the CPA if the jury found that appellants and the landlord made an agreement that appellants would be responsible for painting the apartment, including any areas with flaking and chipping paint. In determining whether the above jury instruction was correct, we must examine certain sections of the Baltimore City Code, the CPA, and the relevant case law. *See Benik*, 358 Md. at 520, 750 A.2d 10. We will begin our analysis with an examination of the CPA.

The Maryland General Assembly enacted the CPA in 1973, finding that the existing laws that offered protection to consumers were "inadequate, poorly coordinated, and not widely known or adequately enforced." Md.Code (1975, 1990 Repl. Vol.), § 13–102(a) of the Commercial Law Article. The General Assembly stated that the legislation was intended "to set certain minimum statewide standards for the protection of consumers across the State," *id.* § 13–102(b)(1), and concluded that the legislature "should take strong protective and preventive steps to investigate unlawful consumer practices, to assist the public in obtaining relief from these practices, and to prevent these practices from occurring in Maryland." *Id.* § 13–102(b)(3). In its application, the CPA is to be construed "liberally to promote its purpose." § 13–105.

The CPA prohibits any person from engaging in "any unfair or deceptive trade practice" in reference to certain specified activities, including the lease or rental, and the offer for lease

or rental, of consumer realty. § 13–303(1) and (2). Section 13–301 of the CPA includes a non-exhaustive list of unfair or deceptive trade practices. Appellants' claim focuses on section 13–301(9), which provides that "unfair or deceptive trade practices" include any:

(9) Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with:

(i) The promotion or sale of any consumer goods, consumer realty, or consumer service; or

(ii) A contract or other agreement for the evaluation, perfection, marketing, brokering or promotion of an invention; or

(iii) The subsequent performance of a merchant with respect to an agreement of sale, lease, or rental.[3]

We next turn to an examination of certain relevant provisions of the Baltimore City Code. The purpose of the Baltimore City Housing Code ("the Code") is:

to establish and maintain basic minimum requirements, standards and conditions essential for the protection of the health, safety, morals and general welfare of the public and of the owners and occupants of dwellings in the City of Baltimore; to establish minimum standards governing the condition, use, operation, occupancy and maintenance of dwellings and other structures, and the utilities, facilities and other physical components, things and conditions to be supplied to dwellings in order to make dwellings safe,

---

**3.** Appellants' arguments focus on § 13–301(9). Section 13–301(1), (2), and (3) may also be relevant. These provisions do not require *"knowing* concealment, suppression, or omission of any material fact" and "the *intent* that a consumer rely upon the same" as does § 13–301(9)(emphasis added). Further, both *Benik* and *Golt v. Phillips*, 308 Md. 1, 517 A.2d 328 (1986), case law which appellants primarily rely upon, were decided based on § 13–301(1), (2), and (3) and not § 13–301(9). The *Golt* Court specifically compared § 13–301(1), (2), and (3) with § 13–301(9), noting that the former only require a false or deceptive statement with the capacity to mislead a consumer tenant, while the latter requires scienter on the landlord's part.

sanitary and fit for human habitation; to fix certain responsibilities and duties of owners, operators, agents and occupants of dwellings ... to authorize and establish procedures for the inspection of dwellings, the correction of violations of the provisions of this Code and the condemnation of dwellings, so as to eliminate and to prevent all conditions in and about dwellings which are now or which may in the future become so unsafe, dangerous, unhygienic or insanitary as to constitute a menace to the health and safety of the people....

Baltimore City Code (1983 Repl.Vol.), Art. 13 § 103. Like the CPA, the provisions of the Code are to be liberally construed to effectuate its stated purposes. *Id.* All buildings or parts of buildings used as dwellings must "be kept in good repair, in safe condition, and fit for human habitation." § 702. Section 703 contains a nonexclusive list of standards which must be met in order for a dwelling to be considered in good repair and safe condition. A requirement of section 703 is that "[a]ll walls, ceilings, woodwork, doors and windows shall be kept clean and free of any flaking, loose or peeling paint and paper." § 703(2)(c). Section 706 deals specifically with painting and provides, in relevant part:

All interior loose or peeling wall covering or paint shall be removed and the exposed paint shall be placed in a smooth and sanitary condition. No paint shall be used for interior painting of any dwelling, dwelling unit, rooming house or rooming unit unless the paint is free from any lead pigment.

Section 310 places the responsibility for compliance with all Code provisions on the shoulders of the owner or operator of a property that is subject to the Code. All buildings, structures, or premises used, designed, intended, or maintained for human habitation are subject to the Code. § 104. Section 310 further states that an owner is to be held liable for any violations of the Code that occur in connection "with any land, buildings, structure, or matter or thing owned or operated by him...." Furthermore, an owner is prohibited from leasing or subletting any dwelling unit that is not in compliance with

the Code, absent special permission obtained from the Commissioner of Housing and Community Development. § 1001.

Finally, § 9–14.1 of the Baltimore City Code of Public Local Laws (1980) mandates that all landlords be deemed to give an implied warranty of fitness for human habitation "[i]n any written or oral lease or agreement for rental of a dwelling intended for human habitation. . . ." According to this implied warranty, all landlords warrant that "the premises shall not have any conditions which endanger the life, health and safety of the tenants, including, but not limited to vermin or rodent infestation, lack of sanitation, lack of heat, lack of running water, or lack of electricity." § 9–14.1(b)(3). The implied warranty of fitness for human habitation may not be waived. § 9–14.1(d).

The Court in *Brown v. Dermer*, 357 Md. 344, 744 A.2d 47 (2000), a negligence action, examined most of the above provisions of the Baltimore City Code and concluded:

[I]t is clear that it is unlawful to lease a dwelling with flaking, loose or peeling paint and that no premises are to be leased for human habitation, except those that are fit for human habitation, *i.e.* those that are kept in good repair and safe condition as defined in the Baltimore City Code. To be sure, § 706 prohibits the use of lead-based paint for interior painting in a dwelling unit; however, neither it nor § § 702 or 703 limits the prohibition of flaking, loose or peeling paint to lead-based paint. To be a violation, all that must be shown is that there was flaking, loose or peeling paint, without any further showing as to the content of the paint. Moreover, none of the provisions of the Housing Code premises violation on the landlord's knowledge of the hazards of lead-based paint.

*Id.* at 361, 744 A.2d 47; *see also Benik*, 358 Md. at 521–22, 750 A.2d 10.

The Court in *Golt v. Phillips*, 308 Md. 1, 517 A.2d 328 (1986), was faced with the issue of whether leasing an unlicensed dwelling unit constituted an unfair or deceptive act under the CPA. *Id.* at 4, 517 A.2d 328. In *Golt*, an elderly,

disabled retiree responded to an advertisement by Phillips Brothers and Associates ("Phillips Brothers") that offered the rental of a furnished apartment. Following an inspection of the apartment and receiving assurances that necessary repair work would be done, Golt signed a month-to-month lease, paid the first month's rent and a security deposit, and moved into the apartment. Upon learning that the toilet facilities were located outside the apartment and would have to be shared with another tenant and receiving no response to the requests he put in for the needed repair work, Golt called the Baltimore City Department of Housing and Community Development. In addition to finding other housing code violations, the housing inspector discovered that the landlord did not have the requisite license or inspection to operate the building as a multiple dwelling.

The *Golt* Court concluded that advertising and renting an unlicensed dwelling violated § 13–301(1), (2), and (3). Observing that a provision of the Baltimore City Code prohibited the operation of a multiple family dwelling without a license or temporary certificate, the Court stated that "[i]mplicit in any advertisement and rental of an apartment is the representation that the leasing of the apartment is lawful." *Id.* at 9, 517 A.2d 328. Phillips Brothers did not have a license nor a temporary certificate, and thus were in violation of the Code and could not provide Golt with the unimpeded right to possession during the term of the lease. As such, the advertisement and rental of the apartment by Phillips Brothers was a "misleading ... statement ... or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers." *Id.* (quoting § 13–301(1)).

The *Golt* Court further held that Phillips Brothers violated § 13–301(2) for making a representation that the "realty ... [has] a sponsorship, approval ... [or] characteristic ... which [it does] not have." *Id.* (quoting § 13–301(2)). The Court stated it made no difference that Phillips Brothers did not expressly state that the premises were properly licensed because "such a basic prerequisite to any lease agreement is implied." *Id.* (citing *Spiegel, Inc. v. Federal Trade Commis-*

*sion,* 411 F.2d 481, 483 (7th Cir.1969); *Aronberg v. Federal Trade Commission,* 132 F.2d 165, 167 (7th Cir.1942); *In the Matter of Seekonk Freezer Meats, Inc.* 82 F.T.C. 1025, 1054 (1973)).

Finally, the *Golt* Court held that Phillips Brothers were liable under § 13–301(3) of the CPA, which provides that the failure to disclose a material fact which deceives or has the tendency to deceive constitutes an unfair or deceptive trade practice. *Id.* at 10, 517 A.2d 328. As stated by the Court:

The lack of proper licensing is a material fact that Phillips Brothers failed to state. In addition, failure to disclose this fact deceived Golt or at least had the tendency to deceive consumers. An omission is considered material if a significant number of unsophisticated consumers would attach importance to the information in determining a choice of action.

*Id.* (citations omitted).

In *Benik,* the Court was faced with deciding whether proof of scienter is a prerequisite to finding a landlord liable for a violation of the CPA for harm caused by a child's ingestion of lead-based paint, when the child's dwelling contained chipping and flaking paint at the inception of the lease, in violation of the Baltimore City Housing Code. 358 Md. at 510–11, 750 A.2d 10. The Court held that scienter is not a requirement; the law implies a representation by the landlord as to the condition of the premises at the time of the lease that a reasonable inspection, had it been conducted, would have disclosed. *Id.* at 533, 750 A.2d 10.

In examining the implied warranty for human habitation contained in § 9–14.1 of the Baltimore City Code of Public Local Laws, and §§ 702, 703, and 706 of the City Code, which give meaning to the implied warranty, the Court in *Benik* stated:

To prove a violation of the CPA premised on the breach of the implied warranty of habitability, it must be shown that, at the inception of the lease, the landlord made material misstatements or omissions, which either had the tendency

to or, in fact, did, mislead the tenant. Thus, the landlord must have knowledge, constructive or actual, of the condition of the premises at the time of the lease.

The implied warranty provisions establish a threshold for the lease of premises and that threshold is based on the purpose of the Baltimore City Housing Code, to "make dwellings safe, sanitary and fit for human habitation," for the benefit of "the health and safety of the people." . . . . [These provisions] are examples of public health and safety regulations. See *Golt*, 308 Md. at 13, 517 A.2d at 334.

*Id.* at 531, 750 A.2d 10. While there was evidence in *Benik* that the landlord did not disclose chipping or flaking paint before leasing the property to the tenant, the landlord argued that he had neither actual knowledge of the chipping or flaking paint nor reason to know of the condition. *Id.* at 532, 750 A.2d 10. In response to this argument, the Court stated as follows:

As the owner of the premises and the landlord, on whom the law imposes specific duties and obligations in connection with the lease of the premises, including implying a representation as to the premises' condition at the time of the lease, the law imputes the requisite knowledge to the petitioner. . . . [T]he landlord need not inspect the premises before leasing, but because of the implied representation that accompanies the making of the lease, he or she fails to do so at his or her peril. This recognizes, as we noted in *Richwind*, 335 Md. at 685, 645 A.2d at 1159, that "[a]t the time the lease is entered into, a landlord has superior knowledge of the condition of the premises." Moreover, to hold otherwise would be to encourage landlords not to take seriously the obligations imposed upon them by the City Code; they would be placed in a better position due to their willful ignorance than they would have been in if they had performed their duties. *Id.*

*Id.* at 532–34, 750 A.2d 10 (citations omitted).

In *Benik* there was evidence that the tenant never informed the landlord of the existence of chipping or flaking paint in the

premises at the inception of the lease, that the apartment was freshly painted, passed a Section 8 inspection, and was inspected by the tenant before renting it. *Id.* at 534, 750 A.2d 10. Nevertheless, the Court still held there was evidence from which the jury could have found that the apartment contained chipping and flaking paint at the start of the lease and that it was up to the jury to determine which factual scenario to accept. The presence of flaking and chipping paint in the apartment at the inception of the lease is a basis upon which a jury could find a violation of the CPA because

> implicit in the rental of an apartment is the representation that the rental is lawful, Golt, 308 Md. at 9, 517 A.2d at 332, and that the apartment is in good repair, in safe condition and fit for human habitation, § 9–14.1; an apartment with flaking, loose and peeling paint has not been maintained "in good repair and safe condition" and, therefore, is in violation of the Housing Code; § 1001 makes it illegal to rent a dwelling unit containing Housing Code violations.

*Id.* at 534, 750 A.2d 10.

The specific holding in *Benik* was that the trial court erred in instructing the jury that the landlord had to be aware of deteriorated *lead-based* paint on the premises in order to constitute a violation of the CPA. It does not answer the question before us, whether knowledge on the part of the tenant of deteriorated paint and the tenant's agreement to repaint prevents liability.

██ After considering the CPA, the Baltimore City Code, and the applicable case law, we agree with appellants that the trial court's instruction to the jury regarding the CPA issue was reversible error. The jury was instructed that it could not find a violation of the CPA if the jury found that "the landlord and tenant had an agreement that the tenant would paint the entire apartment, including all areas which, if there are any, that have flaking paint." The tenants in this case testified there was flaking, chipping, or peeling paint in the apartment at the inception of the lease of which they were aware, but argue that they were unaware of the potential

hazards of lead poisoning, believing that the defective paint was simply an eyesore. Mr. Poff, on the other hand, claims to have been unaware that any peeling, chipping, or flaking paint existed in the apartment at the inception of the lease but did have knowledge that lead-based paint is a health risk and poses a potential problem in older housing.

With respect to Mr. Poff's claim that he was unaware of the existence of flaking, chipping, or peeling paint at the inception of the lease, the law imputes knowledge of the premises' condition to landlords due to the implied warranty of human habitability and the duties imposed by the Baltimore City Housing Code. *Id.* at 532–34, 750 A.2d 10. Thus, the issue is whether, if the jury found that deteriorated paint existed, Mr. Poff could be found to have engaged in an unfair or deceptive trade practice by renting an apartment to tenants who knew it contained flaking paint but claim not to have had knowledge of the potential hazards such flaking paint might present.

As stated above, landlords are held to an implied warranty of fitness for human habitation that a dwelling not contain any conditions which might endanger the life, health, or safety of its tenants. Baltimore City Code of Public Local Laws (1980), § 9–14.1. Provisions of the Baltimore City Housing Code set minimum standards and thereby give meaning to the implied warranty. *See Benik,* 358 Md. at 531, 750 A.2d 10. Similar to the implied warranty of fitness, one of the purposes of the Baltimore City Housing Code is to make dwellings safe, sanitary, and fit for human habitation. Baltimore City Code (1983 Repl.Vol.), Art. 13 § 103. Provisions like §§ 703 and 706 mandating the removal of flaking, loose, or peeling paint were included in the Housing Code to give effect to its purposes, including the promotion of the health and safety of tenants in dwellings in Baltimore City.

Responsibility for compliance with the Baltimore City Housing Code lies solely with the owner/operator of the dwelling, § 310, and a landlord is prohibited from leasing a dwelling unless it is in compliance with the Code. § 1001. As stated in

*Golt,* "[i]mplicit in any advertisement and rental of an apartment is the representation that leasing of the apartment is lawful." 308 Md. at 9, 517 A.2d 328. Also in *Golt,* the Court stated, "[s]imply viewing an apartment cannot inform a prospective tenant that the premises are unlicensed . . . . [t]herefore, at the time Golt signed the lease, he cannot be said to have had knowledge that the premises was not licensed." *Id.* at 11, 517 A.2d 328. The *Golt* Court imposed liability on the landlord despite the tenant's inspection of the apartment.

In the case before us, the tenants had knowledge of the flaking paint but stated they did not know of the potential hazards inherent in that paint. The landlord did not advise the tenants of that potential hazard, although it possessed such knowledge.

As stated in *Benik,* to prove a violation of the CPA, § 301(1)(2) or (3), based on the breach of the implied warranty of habitability, it must be shown that the landlord made a material misstatement or omission at the inception of the lease that either had the tendency to, or actually did, mislead the tenant. *Id.* A landlord is charged with knowledge of the condition of the premises that a reasonable inspection would disclose. If a jury finds that deteriorated paint existed, the landlord's failure to warn the tenant of the existence of that condition could be found to be a material omission by the jury.

If the tenant's knowledge is as great as that of the landlord, there would ordinarily be no deception, but if the landlord's knowledge, actual or constructive, is greater than that of the tenant, a jury may find a violation of the CPA. A landlord's actual knowledge may be greater than the knowledge imputed to it, *i.e.,* greater than that which a reasonable inspection would disclose. In this case, Mr. Poff had actual knowledge of the potential hazards of lead-based paint and the tenants testified they did not have such knowledge. The question of whether the failure to disclose that actual knowledge was material and in fact deceptive was a question for the jury.

■ An omission is considered material if a "significant number of unsophisticated consumers would attach importance to the information in determining a choice of action." *Golt v. Phillips*, 308 Md. 1, 10, 517 A.2d 328 (1986); *Green v. H. & R. Block*, 355 Md. 488, 524, 735 A.2d 1039 (1999). A jury could reasonably find that the hazardous nature of a condition in an apartment would be a factor that a significant number of people would consider important when deciding to rent an apartment.[4] If the tenant is deceived and the hazardous condition causes damages, liability is established. As a result, the trial court erred in its instructions.

■ While not necessary given the result we reach with regard to appellants' CPA claim, we will nonetheless address appellants' claim that Mr. Forrest was an agent of Mr. Poff and P & L Real Estate. In order to impute Mr. Forrest's negligence or knowledge to Mr. Poff or P & L on an agency theory, appellants had the burden of proving the existence of the agency relationship and its nature and extent. *Proctor v. Holden*, 75 Md.App. 1, 20–21, 540 A.2d 133 (1988). An agency relationship may be established either by written agreement or by inference. *Patten v. Board of Liquor*, 107 Md.App. 224, 238, 667 A.2d 940 (1995). No evidence of a written agreement was presented in this case. In the absence of a written agreement, the following three factors are examined in order to determine if an agency relationship exists: (1) the agent is subject to the principal's right of control; (2) the agent has a duty to act primarily for the benefit of the principal; and (3) the agent holds a power to alter the legal relations of the principal. *Id.* (citing *Schear v. Motel Management Corp.*, 61 Md.App. 670, 687, 487 A.2d 1240 (1985) (citing to *Restatement (Second) of Agency* §§ 12–14 (1982))). We conclude from our review of the record that appellants failed

---

4. Additionally, if evidence justifies a reasonable inference that a landlord *knowingly* omitted or misrepresented material information *with the intent* that a tenant rely on the omission/misrepresentation, liability may attach under § 13–301(9) and an instruction to that effect would be proper.

to produce any evidence from which a reasonable inference could be drawn that an agency relationship had been created.

### III

Appellants contend that the trial court erred in its negligence instructions by failing to instruct regarding constructive notice and by stating that actual notice was required. Appellants point to the following instruction:

> The jury must find, first of all, that the tenant notified the landlord of the existence of chipping or flaking paint prior to or during the period of exposure of the young children to lead paint. Notice, you see that. That the—that's what I've said so far. If it's there, and the tenant didn't tell the landlord about it, then the landlord's not held to be responsible You've got to tell them. The failure of the landlord to be notified of the exist[ence] of chipping or flaking lead-based paint [m]eans that the landlord can not be held responsible for any negligent conditions which may have occurred in the apartment during the tenancy of the plaintiffs—plaintiff. And if you find a failure of notice, you must find for the defendant with respect to this count.

Appellants explain that a landlord is not responsible for a defective condition on his or her property, such as lead-based paint, unless the landlord either knows or has reason to know of the condition and has a reasonable opportunity to correct the condition. *Richwind Joint Venture 4 v. Brunson,* 335 Md. 661, 672–76, 645 A.2d 1147 (1994). Appellants further argue that all a plaintiff must show to satisfy the reason to know element in a lead poisoning negligence action based upon a violation of the duties imposed by the Baltimore City Housing Code is that there was flaking, loose, or peeling paint and that the landlord had notice of the condition. A plaintiff does not have to show that the landlord had actual notice that the flaking, loose, or peeling paint was lead-based. *See Brown v. Dermer,* 357 Md. 344, 363, 744 A.2d 47 (2000).

Appellants refer us to the following evidence. The tenants at 2507 Madison Avenue testified that they did not complain to

P & L Real Estate and Poff regarding defective paint in the apartment. Mr. Forrest stated that he did not complain because he did not recognize it as a danger to his children. Evidence was presented that Mr. Poff was in the apartment before the lease and during the tenancy. Additionally, with respect to 2501 Madison Avenue, Ms. Murphy testified that either she or her leasing agent would have been present in the apartment before the lease to show it to the prospective tenants, although she disputed the tenants' account of complaints about defective paint.

Preliminarily, we note (1) that this contention is applicable to all defendants, (2) the references to 2501 Madison Avenue relate to Apt. 2–R, occupied by the Elliotts, and (3) the references to 2507 Madison Avenue relate to Apt. 3A.

Second, we acknowledge appellees' argument that this issue was not preserved for appellate review. They point out that appellants only requested an instruction relating to constructive notice of the presence of lead, not of deteriorated paint. Additionally, after exceptions to instructions were taken at the bench and the court gave supplementary instructions, appellants expressed satisfaction with the instructions.

The Murphys argue that the trial court did give instructions on constructive notice and that they were adequate. They point out that the court instructed the jury that evidence of a violation of the housing code could be considered evidence of negligence and that this instruction was very favorable to appellants in that it complied with *Brown v. Dermer*, 357 Md. 344, 744 A.2d 47 (2000), by not requiring a plaintiff to prove that the defendant had knowledge that the paint was lead-based, even though the *Brown* case had not yet been decided at the time of trial. In other words, they argue that the jury was instructed that appellants need not prove that appellees knew that the paint contained lead. Consequently, a failure to give a constructive notice/reason to know instruction, if error, was harmless.

The Murphys also argue that, while appellants assert that the case against P & L Real Estate and Poff was based on

constructive notice, the case against the Murphys was based on evidence of actual notice of deteriorated paint. The Murphys assert that in light of the code violation instruction, the jury obviously did not believe that the apartment contained deteriorated paint.

Additionally, the Murphys claim there was no evidence of constructive notice and argue that appellants' case was based on (1) a leasing agent's walk-through of the apartment at the time the Elliotts rented it and (2) the fact that the Elliotts informed the Murphys that their children had sustained lead poisoning. With respect to the first point, the Murphys argue that the evidence was to the effect that there was no hazard when the apartment was rented, in accordance with the testimony of Ms. Elliott and the May, 1992 inspection, and there was no evidence of agency.[5] With respect to the second point, the Murphys argue that the factual premise is legally insufficient to support the inference.

P & L Real Estate and Poff also argue that constructive notice was not applicable to appellants' claims against them. They point out that the tenants admit that they did not complain to the landlord with respect to deteriorated paint during their tenancy in Apt. 3A. Conflicting evidence was presented as to whether that condition existed at the inception of the lease. Appellants claimed that Mr. Poff knew about the condition of the apartment from being in the apartment and this, according to P & L Real Estate and Poff, constituted actual knowledge.

Once again, we find it necessary to set forth in full the court's instructions to the jury with respect to negligence. They were as follows:

---

**5.** The discussion of agency is in reference to the relationship between the person who showed the property to the Elliotts at the time they rented the apartment and the Murphys. The Murphys argue that even if the walk-through of Apartment 2–R before the tenants moved in was sufficient to constitute "reason to know" of any alleged deteriorated paint, there is no evidence that such "reason to know" may be imputed to the Murphys due to the lack of evidence that this person was the Murphys' agent.

THE COURT: Okay. Now we're going to go to negligence. Now both defendants are charged with negligence, so this instruction would apply to both of them. And I say charge, I'm not talking about a criminal case, that means they've been sued for that.

In order to find negligence in this case with respect to the ownership of the apartments at 2501 and 2507 Madison Avenue, where the plaintiff either leased or visited, do you remember in one case lease, and the other case we have a visit, that's 2501.

The jury must find, first of all, that the tenant notified the landlord of the existence of chipping or flaking paint prior to or during the period of exposure of the young children to lead paint. Notice, you see that. That'[s] the—that's what I've said so far.

If it's there, and the tenant[ ]s didn't tell the landlord about it, then the landlord[ ]s not held to be responsible. You've got to tell them.

The failure of the landlord to be notified of the exist[ence] of chipping or flaking lead-based paint means that the landlord can not be held responsible for any negligent conditions which may have occurred in the apartment during the tenancy of the plaintiffs—plaintiff.

And if you find a failure of notice, you must find for the defendant with respect to this count. On the other hand, if you find that there was in fact chipping and flaking lead-based paint in the apartment, either during or prior to the exposure of the young children to the lead paint in question, and if you further find that the landlord was notified of this condition, then you must decide whether or not the landlord had a reasonable time in which to effectuate a repair.

That probably doesn't really happen—apply to this case, because there's a dispute as to whether there was notification. One side says there was and the other side says there wasn't, so it's not a question of how much time, it's a question whether you believe [there was] notification or not notification.

Or whether you believe the landlord already knew about it before he leased the apartment. Or whether or not it—he was told about it during the time that the lease took place, if it existed in fact.

If you find the landlord did not have a reasonable time in which to effectuate the repair, then in that event you may find for the defendant. On the other hand, if you find that notice did exist, and the landlord has—has had a reasonable time to effectuate the repair but failed to do so, then in that effect negligence exists and you may find for the plaintiffs.

Now negligence of a parent [is] not imputed to children. So if you thought that Ms. Brown was negligent, you can't blame that on these two young children.

And responsibilities of owners and operators of property, they are responsible to comply with the provisions of the code which say all interior loose or peeling wall covering or paint shall be removed and the exposed surface shall be placed in a smooth and sanitary condition. All walls, ceilings, woodwork, doors and windows should be kept clean and free of any flaking, loose peeling paint and paper.

Every building in Baltimore City which is occupied as a dwelling, is to be kept in good repair, safe condition, and fit for habitable conditions. And the law says that if you find that the owner of a building if his agent or representative, such as Mr. Poff, and the—anything that Mr. Poff knows binds the partnership.

Do you understand that? Or any time your agent is doing something for you, if you find that an agency exists, the actions of the agent bind the principle. The principle being the owner of the property.

And of course, owners are bound or presumed to know what the code is. [Their] ignorance of the law is no excuse.

Now you must further find that the—that if there was a violation of the laws or the—and you find that these violations of the law did—did exist, you must also find that they

are the proximate cause of any injuries that are complained of.

You know what I'm talking about. There if you have an automobile accident and you're in the car as a passenger but you weren't hurt in the accident but later on you—you got out of the car and fell, you can't blame the accident on the fact that you fell. There's no connection. You['ve] got—you['ve] got to show injury connected up with the cause.

Now children under six, both were under six at the time of this accident, can not be guilty of contributory negligence. They—even if they may be careless, which I'm not sure there is any evidence in this case or if there is, they can't contribute to their own injuries. Minors can not contribute to their own injuries.

At the conclusion of the instructions, appellants took exception, in pertinent part, as follows:

[APPELLANTS' COUNSEL]: Okay. And then just to—as to the negligence, as the negligent one, Your Honor said that the negligent standard was that, I wrote it down, tenant notified the landlord prior to the period of exposure.

Your Honor did not give any instructions about reason to know or constructive notice. Those are contained in my instructions.

THE COURT: Well, what do you mean?

[APPELLANTS' COUNSEL]: You know that, I think, under the Richland—

[COUNSEL FOR THE MURPHYS]: This is (inaudible) case?

THE COURT: You mean a reason to know or that the building had lead paint in it, you mean?

[APPELLANTS' COUNSEL]: Yes. Yes.

THE COURT: This is with respect to—

[APPELLANTS' COUNSEL]: To the negligence case. Meaning it's not something, you know, [that] is noticeable.

THE COURT: I didn't see the—first of all, they must be notified.

[APPELLANTS' COUNSEL]: All right.

THE COURT: And—

[APPELLANTS' COUNSEL]: There's different ways to be notified.

THE COURT: Yeah.

[APPELLANTS' COUNSEL]: It could be actual notice or [re]constructive notice. And in constructive—

THE COURT: What was the constructive notice [ ] in this case?

[APPELLANTS' COUNSEL]: Constructive notice would be reason to know meaning (inaudible) from the facts. Like landlord has a certain background, certain level of experience. They know about lead in general. They're [ ] experienced being a landlord. And then—then they know that there's to repaint—

THE COURT: Here's why—here's the problem with it. First of all, the reason to know applies to the fact that there's no specific evidence in this case to show that Murphy actually knew about lead paint. But I've ruled against that and I've held that the fact that he had so much experience in the field that there was reason to believe that he knew about it and therefore I gave the instruction that the mere presence of flaking or chipping is of itself sufficient to carry the case to the jury.

Now, what that instruction of mine did was it carried it beyond the fact that the mere presence of flaking or chipping paint doesn't have to be coupled. I'm not telling you they don't have to find that the Murphy[ ]s knew that there would have been lead paint. Do you see what I mean?

So it really was favorable to you. What you're doing is throwing an extra mention there and you're now saying something [ ] to determine whether he knew or didn't know. I said it was a matter of law [ ] sufficient evidence for them to know that.

[APPELLANTS' COUNSEL]: I just, you know, I respectfully disagree. I just want [to] make the record, Your Honor.

THE COURT: Because otherwise the ability to have notice can't be by some reflection off a cloud that there was chipping or flaking paint. It has to be actual notice.

[APPELLANTS' COUNSEL]: Insist it contain in my instructions Number 2—

THE COURT: Uh-huh. You disagree with that?

(Inaudible).

[COUNSEL FOR P & L REAL ESTATE AND POFF]: No, Your Honor.

[APPELLANTS' COUNSEL]: You know, what I'm arguing—

THE COURT: Times change you know, maybe I'm out of date.

[APPELLANTS' COUNSEL]: It's just the—it's the Richland—(inaudible) decision, 335 Md. 66 through 1. And the reason to know the standard contained there and I think it's in my instruction, Number 2.

THE COURT: Slow down.

[APPELLANTS' COUNSEL]: I'm sorry.

THE COURT: Slow down. I can't keep up with you.

[APPELLANTS' COUNSEL]: I'm (inaudible). I'm in the speed zone now. Okay.

THE COURT: The [hand] didn't work that fast.

[APPELLANTS' COUNSEL]: My usually doesn't it's just hyper-activity. All right. That's all I have actually (inaudible) it's junction number 10, Your Honor.

THE COURT: Yeah, I remember that one. That was that great big [summary].

[APPELLANTS' COUNSEL]: Yeah, the—

THE COURT: I thought I covered it.

[APPELLANTS' COUNSEL]: A great big [summary]. Then there's an instruction Number 11—

THE COURT: I'd like [your] 10 but I just simply think I gave it anyway.

[APPELLANTS' COUNSEL]: Okay. And Instruction Number 11, can that—that basically takes care of that issue. I'll just make a note here.

I also had an instruction about exercising reasonable care with children. This is a quote out of these two cases. These two cases were—

THE COURT: Let me read it. It [will] be quicker. Here's Number 2.

[APPELLANTS' COUNSEL]: That's actually a very bad 1, Judge.

(Pause.)

THE COURT: No, I think I covered that. Let me have (inaudible).

[APPELLANTS' COUNSEL]: I have an exception to my Number 1 for—for the cases stated there it's (inaudible) v. Maryland, Farms Condominium, Phase 1, Inc. And Medina versus Millhammer. (Inaudible).

THE COURT: I'm not disagreeing with the—what it says. I think I've covered it.

[APPELLANTS' COUNSEL]: Number—my Number 2, you might have covered this. We're just having an abundance of caution—

THE COURT: Let me see that again.

[APPELLANTS' COUNSEL]: (inaudible). If it's something at the beginning of the lease, [the] landlord is deemed to have knowledge [of] that. I think you might have covered that.

[COUNSEL FOR P & L REAL ESTATE AND POFF]: (Inaudible).

THE COURT: Yeah. I—I told him in both situations, both negligence and Consumer Protection Act, the landlord is charged with the knowledge—

[COUNSEL FOR THE MURPHYS]: And you may argue that.

THE COURT: Charged with knowledge of what the premises have.

[APPELLANTS' COUNSEL]: Okay.

THE COURT: I did it specifically with respect to Consumer Protection and then I added it in to my other instruction on negligence.

[APPELLANTS' COUNSEL]: I have my Number 6 as the Miller v. Howard instruction on negligent repair. I think there was some evidence in this case about the hole in the wall. And they fixed that and it fell back. And they fixed it again. And then—I just—one like an instruction about that that if the landlord undertakes repairs and do it in a reasonable fashion.

[COUNSEL FOR P & L REAL ESTATE AND POFF]: You don't have any proof that that has anything to do with what these kids injuries—

THE COURT: Well no, they said that—overruled.

[APPELLANTS' COUNSEL]: Overruled? All right. (Inaudible) keep my mouth shut.

[COUNSEL FOR P & L REAL ESTATE AND POFF]: (Inaudible).

[COUNSEL FOR THE MURPHYS]: (Inaudible).

THE COURT: Yeah, he said he went in and—and repaired it. And the tenant—not your (inaudible). He said it was the hole in the wall behind the rocking chair.

[APPELLANTS' COUNSEL]: Okay. I think Your Honor covered the agency pretty well. I had a bunch of those.

(Pause.)

[APPELLANTS' COUNSEL]: Okay. That's it as far as the instructions that weren't given, Your Honor. I would object—I would object to that instruction, the special one that you drafted, you know, in response to true—true (inaudible).

THE COURT: Yeah. You're talking about the instruction with respect to the painting—

[APPELLANTS' COUNSEL]: With the agreement—

THE COURT:—agreement between the landlord and the tenant.

[APPELLANTS' COUNSEL]: Yes, Your Honor.

THE COURT: Where you have your exception.

[APPELLANTS' COUNSEL]: Okay. I just want—my reasons for exception under Goldleaf–Phillips, the Maryland case we discussed earlier. I don't think that it—under there. Also I think that the—the (inaudible) was a little bit broad. You know, you said at what point if you find that the responsibility shifted and the landlord cannot be held responsible. ·

I think that was a little bit broad. Whether it was under CP and negligence, just CPA, or both.

THE COURT: Well, no, we were talking about CPA.

[APPELLANTS' COUNSEL]: Okay.

THE COURT: I thought I made it clear. I went over it several times.

[APPELLANTS' COUNSEL]: Okay.

THE COURT: And they all said they understood it. I think they did.

[APPELLANTS' COUNSEL]: Okay.

After the exceptions, the court gave additional instructions. Following the additional instructions, the following occurred:

All right, folks?

Now, does that cover them?

[APPELLANTS' COUNSEL]: Yes, Your Honor.

[COUNSEL FOR P & L REAL ESTATE AND POFF]: Yes, Your Honor.

[COUNSEL FOR THE MURPHYS]: Yes, Your Honor.

██ We have set out the above in considerable detail to aid our discussion with respect to the issue of what was preserved for appellate review. First, the additional instructions given after exceptions were not instructions requested by appellants. We decline to find any waiver by appellants based on their indication that everything requested had been covered after those additional instructions had been given.

■ With respect to the exceptions taken in the first instance, however, the result is less clear. Appellants referenced written instruction No. 2, but written instruction No. 2 was in fact given. Appellants also referenced requested written instructions 10, 11, and 12. They appear to have been given in large part but were not given to the extent that they addressed "reason to know."

At one point during the exceptions, appellants indicated that the court had failed to instruct the jury with respect to the concept that the landlords could have constructive notice that the building contained lead-based paint, and the court responded that the jury had been instructed that the mere presence of deteriorated paint was sufficient. The court did not give an instruction, however, with respect to the reason to know standard as applicable to the presence of deteriorated paint, without reference to whether it was lead-based.

■ Md. Rule 2–520(e) states: "No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection." In *Fearnow v. Chesapeake & Potomac Tel. Co.*, 342 Md. 363, 378, 676 A.2d 65 (1996), the Court examined case law interpreting Rule 2–520(e) and its precursor, Md. Rule 554(d), and stated that the appellate courts have consistently required precision in objections to jury instructions at trial. Such precision in the nature and grounds of the objection is necessary in order to give the trial judge the opportunity to supplement, correct, or amplify the instructions to the jury. *Id.* (citations omitted). There is, however, some flexibility in Md. Rule 2–520(e) if the objection is in "substantial compliance" with the rule. *Id.* at 381, 676 A.2d 65. The requirements of the preservation rule are met when further exposition of the ground for objection would be "fruitless and unnecessary." *Id.* (citing *Sergeant Co. v. Pickett*, 283 Md. 284, 289–90, 388 A.2d 543 (1978)). Once the trial court indicates that it comprehends yet rejects the precise point asserted, Md. Rule 2–520(e) has been satisfied. *Id.*

In arguing that appellants failed to preserve the issue for review, appellees assert that appellants only requested an instruction relating to constructive notice of the presence of lead, not of deteriorated paint. We disagree and hold that appellants properly preserved an exception to the jury instructions with regard to the omission of an instruction on the "reason to know" standard.

In objecting to the trial court's instructions, appellants specifically mentioned the judge's failure to include "reason to know" or "constructive notice" in the jury instructions several times. The trial court questioned appellants as to the factual basis for constructive notice. Upon hearing appellants' answer, the court specifically rejected the rationale for the objection and stated that the instruction already given was favorable to the appellants. Following this exchange, appellants continued to object to the omission of an instruction regarding "reason to know," referring the judge to the *Richwind* decision and to the applicable written jury instruction submitted on the point. While appellants' objections were certainly not a model for clarity, the objections were in "substantial compliance" with Md. Rule 2–520(e), in that the trial court was informed of the precise point being objected to and the court rejected the objection, making it futile for the appellants to further expound upon the point. *See Sergeant Co.*, 283 Md. at 289–90, 388 A.2d 543. Thus, "[a]lthough the appellant was on perilously thin ice in terms of preservation, we think the claim has been adequately preserved and we will address the merits." *Roach v. State*, 358 Md. 418, 426 n. 3, 749 A.2d 787 (2000) (quoting *Watkins v. State*, 79 Md.App. 136, 138, 555 A.2d 1087 (1989)).

As first enunciated in Maryland in the *Richwind* decision, a plaintiff in a negligence action based on alleged lead paint poisoning due to a landlord's failure to correct a defective condition in a leased dwelling must initially meet the "reason to know" test. *Richwind*, 335 Md. at 676, 645 A.2d 1147 (citing *Restatement (Second) of Torts* § 358(1)(b)(1965)); *Brown v. Dermer*, 357 Md. 344, 362, 744 A.2d 47 (2000). To

meet this standard, a plaintiff must "present evidence that establishes that the landlord knew or had reason to know of a condition on the premises posing an unreasonable risk of physical harm to persons in the premises." *Brown*, 357 Md. at 361–62, 744 A.2d 47. In discussing the "reason to know" standard, the Court has stated:

> "Reason to know" means that the actor has knowledge of facts from which a reasonable man of ordinary intelligence or one of the superior intelligence of the actor would either infer the existence of the fact in question or would regard its existence as so highly probable that his conduct would be predicated upon the assumption that the fact did exist.

*Richwind*, 335 Md. at 677, 645 A.2d 1147 (quoting *State v. Feldstein*, 207 Md. 20, 33, 113 A.2d 100 (1955)(quoting *Restatement of Torts* § 12 cmt. *a* (1934); *Restatement (Second) of Torts* § 12)). The reason to know standard may be satisfied by showing that flaking, loose, and peeling paint was present in the dwelling and the landlord had notice of that condition. *Brown*, 357 Md. at 362, 744 A.2d 47. It is not necessary to show that the flaking, loose, or peeling paint in question was lead-based. *Id.*

 The trial judge's instructions to the jury contained incorrect statements of the law on two bases: its failure to include an instruction on "reason to know" and its mandate that the landlord must be notified of "chipping or flaking *lead-based* paint." (Emphasis added). *See Richwind*, 335 Md. at 676–81, 645 A.2d 1147 (applying the "reason to know" standard in the context of a negligence action based on allegations of lead-based paint); *Brown*, 357 Md. at 361–62, 744 A.2d 47 (stating that to present the question of negligence to a jury based on violations of §§ 702 and 703 of the Baltimore City Code "all that a plaintiff must show in order to satisfy the reason to know element is that there was flaking, loose or peeling paint and that the defendant had notice of that condition .... [i]t need not be shown that the flaking, loose or peeling paint was lead-based.").

The court's instructions to the jury emphasized that liability depended upon a finding that the tenants gave actual notice to appellees of a defective condition or a finding that appellees had personal knowledge. The instructions at one time did state that notice by the tenant was sufficient if it advised of the existence of deteriorated paint, but on two other occasions the notice referred to deteriorated lead-based paint. Additionally, when personal knowledge of appellees was referred to, it was referred to as "it" without explanation as to whether the landlord's knowledge had to be of deteriorated paint or deteriorated lead-based paint.

When examining jury instructions for their adequacy, courts should "consider the charge as a whole and [ ] not select out words, phrases, or sentences which might, of themselves and out of context, appear to be misleading or inartful." *Schwier v. Gray*, 277 Md. 631, 637, 357 A.2d 100 (1976)(citing *Clayborne v. Mueller*, 266 Md. 30, 40–41, 291 A.2d 443 (1972); *Jones v. Federal Paper Bd. Co.*, 252 Md. 475, 484–85, 250 A.2d 653 (1969)). In reviewing the jury instructions as a whole, it is not at all clear that the jurors would take away from the instructions an accurate understanding of the reason to know standard. There was sufficient evidence to enable a jury to conclude that appellee(s) had reason to know without being advised by the tenants and in the absence of personal knowledge based on a finding, from the testimony of Ms. Murphy and Mr. Poff, that each had been in the apartment at 2501 Madison Avenue and the apartment at 2507 Madison Avenue, respectively, prior to inspection of the leases. A jury could find they had reason to know based on that evidence even though they did not have actual knowledge because they were not in the area in question or they did not see the deteriorated condition, if such existed.

**JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEES.**